Reserve Realty, LLC *v.* Windemere Reserve, LLC

THE RESERVE REALTY, LLC, ET AL. *v.*
WINDEMERE RESERVE, LLC, ET AL.
(SC 19979)
(SC 19982)
THE RESERVE REALTY, LLC, ET AL. *v.*
BLT RESERVE, LLC, ET AL.
(SC 19981)

Robinson, C. J., and Palmer, McDonald, D'Auria,
Mullins, Kahn and Ecker, Js.

*Syllabus*

A tying arrangement is an agreement by a party to sell one product (the
tying product) but only on the condition that the buyer also purchase
a different product (the tied product) or, alternatively, agree not to
purchase that product from another seller.

Pursuant to this court's decision in *State* v. *Hossan-Maxwell, Inc.* (181
Conn. 655), tying arrangements are per se illegal whenever a seller
has sufficient economic power with respect to the tying product to
appreciably restrain competition in the market for the tied product and
a not insubstantial amount of interstate commerce is affected, and a
real estate list-back agreement, which requires the purchaser of real
property to use the services of a particular broker when leasing or
reselling the property, constitutes a tying arrangement that is per se
illegal.

The plaintiffs, R Co., a real estate marketing company, and H, the executor
of the estate of J, a broker who, along with S, was a founding member
of R Co., sought to recover damages from the defendants, W Co. and
B Co., for, inter alia, breach of certain real estate listing agreements
pursuant to which J and S allegedly were entitled to certain brokerage
fees and commissions. In 2002, a group of developers, D Co., engaged
the services of J and S to represent them in negotiating the purchase
of a 546 acre parcel of land in the city of Danbury. D Co. then executed
an agreement with J and S that gave them the exclusive right to sell or
lease the property, or any part thereof, and that required any subsequent
purchaser of the property to give J and S that same exclusive right.
D Co. purchased the property, and the Danbury Zoning Commission
approved D Co.'s plans to develop it, but W Co., which was developing
a neighboring parcel of land, appealed the zoning approval. To resolve
the zoning appeal, D Co. agreed to sell a portion of the property to W Co.
and another portion to B Co. Consistent with the exclusivity provision
in D Co.'s agreement with J and S, W Co. and B Co. reluctantly agreed
to include in their purchase and sale agreements provisions giving J
and S the exclusive right to sell or lease any part of their respective

335 Conn. 174 JULY, 2020 175

Reserve Realty, LLC *v.* Windemere Reserve, LLC

properties, and W Co. and B Co. subsequently executed separate listing agreements with J and S to that effect. Thereafter, B Co. constructed a luxury apartment complex on its property, and W Co. devised plans to construct commercial office space on its property. B Co. ultimately used its own leasing agent to market the apartments, and the plaintiffs initiated the present action, alleging breach and anticipatory breach of the listing agreements. W Co. and B Co. raised a number of special defenses, including that, under antitrust law, the exclusivity provisions in the purchase and sale agreements constituted illegal tying arrangements in violation of the federal Sherman Act (15 U.S.C. § 1 (2018)) and, therefore, were unenforceable. Following a trial to the court, the trial court concluded, inter alia, that the antitrust defense barred the plaintiffs' claims, and the court rendered judgments for W Co. and B Co. In so concluding, the trial court determined that it was required to follow this court's decision in *Hossan-Maxwell*, *Inc.*, and that, pursuant to that decision, the uniqueness of the property at issue was sufficient evidence that D Co., as the sole owner of the property, had sufficient economic power to restrain competition in the market for the tied product, which it identified as real estate listing broker's services in the greater Danbury area. The Appellate Court affirmed the trial court's judgments, concluding that the antitrust defense barred the plaintiffs' claims but indicating that it viewed the relevant tying product market to be large areas of undeveloped land in the densely populated Northeastern United States. On the granting of certification, the plaintiffs appealed to this court, claiming that this court should overrule *Hossan-Maxwell*, *Inc.*, and conclude that list-back agreements, such as the agreements in the present case, are not per se illegal. *Held*:

1. This court concluded, after considering antitrust scholarship on the procompetitive effects of tying arrangements and recent developments in the federal tying jurisprudence of the United States Supreme Court and other federal courts, that a per se ban on list-back agreements is inconsistent with federal antitrust law and, accordingly, overruled its prior decision in *Hossan-Maxwell*, *Inc.*, to the extent that it held that real estate list-back agreements affecting a not insubstantial volume of commerce are per se illegal; moreover, this court clarified the standard to be used to assess whether a party has stated a valid antitrust challenge to a list-back agreement, pursuant to which the challenging party must allege facts plausibly showing that the sale of the tying product was conditioned on the purchase of the tied product, the seller used actual coercion to force buyers to purchase the tied product, the seller had sufficient economic power in the tying product market to coerce purchasers into buying the tied product, which typically is established by demonstrating that a defendant wields market power in a defined product and geographic market, the tie-in had anticompetitive effects in the tied market, and a not insubstantial amount of commerce was involved in the tied market.

Reserve Realty, LLC *v.* Windemere Reserve, LLC

2. This court concluded that, under the facts of the present case, the judg-
ments of the trial court could not be affirmed under the newly clarified
standard governing antitrust challenges to list-back agreements and,
accordingly, reversed the judgments of the Appellate Court and
remanded the cases to that court for consideration of the plaintiffs'
remaining claims.

a. The trial court made no findings as to, and W Co. and B Co. did not
plead the existence of, a defined product or geographic market for
purposes of establishing D Co.'s economic power, but, rather, the trial
court simply relied on *Hossan-Maxwell*, *Inc.*, for the proposition that
the uniqueness of residential property was sufficient evidence of D Co.'s
economic power and did not explain how it reached its conclusions
that the relevant tied product market was limited to the greater Danbury
area, that the relevant market was taken to be listing broker's services,
and that the 546 acre property constituted the entire tying product
market; moreover, because the trial court, the Appellate Court, as well
as W Co. and B Co., articulated different but plausible geographic market
definitions, expert testimony was necessary to determine whether D Co.
held sufficient power in a defined geographic market for real property
of some sort such that it could foreclose competition and coerce buyers
into accepting supracompetitive prices in some particular product
market.

b. The trial court made no findings, and it was unlikely that the record
would support any such finding, as to whether the combined price of
the tying product and the tied product exceeded the combined market
price of those products, which typically must be established in order
to satisfy the requirements that the seller had sufficient economic power
in the tying product market to coerce purchasers into buying the tied
product and that the tie-in had anticompetitive effects in the tied market;
there was no reason to believe that the list-back agreements in the
present case had an anticompetitive effect on pricing, as there was
evidence that D Co. had agreed to sell the parcels to W Co. and B Co.
at a reduced price to resolve the zoning appeal and the parcels ultimately
were sold for a fraction of their appraised values; moreover, even if W
Co. and B Co. felt compelled to accept the broker services of J and S
in order to acquire the parcels, such coercion does not bear on whether
D Co. and the plaintiffs were able to exert market power or suppress
competition, as the fact that W Co. and B Co. individually were willing
to accept the unwanted broker services did not imply that, as a general
matter, D Co. had market power, and there were various explanations
as to why W Co. and B Co. may have been willing, albeit reluctantly,
to accept the exclusivity provisions and to agree to use the broker
services of J and S.

c. Competition policy generally is not offended when only minor foreclo-
sure of competition in the tied market is possible, and, in the present
case, even if the tied product market had been defined narrowly, it was

335 Conn. 174 JULY, 2020 177

Reserve Realty, LLC *v.* Windemere Reserve, LLC

unlikely that the listing agreements could have permitted J and S to monopolize the market for listing broker services for commercial and multifamily residential properties in the greater Danbury area or that the cost of broker commissions and fees in that narrowly defined market would have increased.

Argued September 18, 2018—officially released March 24, 2020*

*Procedural History*

Action, in the first case, to recover damages for, inter alia, breach of contract, and for other relief, and actions in the second and third cases to foreclose broker's liens on certain of the defendants' real property, brought to the Superior Court in the judicial district of Danbury, where, in the first case, the court, *Doherty, J.*, granted the plaintiffs' motion to add Century 21 Scalzo Realty, Inc., as a defendant; thereafter, in the first case, the plaintiffs withdrew the action as to the defendant Century 21 Scalzo Realty, Inc., and, in the second case, the plaintiffs withdrew the action as to the defendant The Reserve Master Association, Inc.; subsequently, the first case was tried to the court, *Truglia, J.*; judgment for the named defendant et al., from which the plaintiffs appealed to the Appellate Court; thereafter, in the second and third cases, the court, *Truglia, J.*, rendered judgments discharging the broker's liens in accordance with the parties' stipulations, and separate appeals were filed with the Appellate Court; subsequently, the Appellate Court, *Alvord, Sheldon* and *Schaller, Js.*, affirmed the judgments of the trial court, and the plaintiffs, on the granting of certification, filed separate appeals with this court. *Reversed*; *further proceedings*.

*Daniel E. Casagrande*, with whom was *Lisa M. Rivas*, for the appellants (plaintiffs).

*Christopher Rooney*, with whom was *Brian A. Daley*, for the appellees (named defendant et al.).

---

* March 24, 2020, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

Reserve Realty, LLC *v.* Windemere Reserve, LLC

*Opinion*

ROBINSON, C. J. These certified appeals invite us to revisit *State* v. *Hossan-Maxwell, Inc.*, 181 Conn. 655, 662–63, 436 A.2d 284 (1980), in which this court held that real estate "list-back" agreements—tying arrangements that commit the purchaser of a parcel of real property to use the services of a particular broker when leasing or reselling the property[1]—are per se illegal under state antitrust law. Specifically, we must decide whether, in light of recent antitrust scholarship and developments in federal tying law, *Hossan-Maxwell, Inc.*, should be overruled. We answer that question in the affirmative. Accordingly, we reverse the judgments of the Appellate Court, which, like the trial court, correctly determined that it was required to apply *Hossan-Maxwell, Inc.*, to the present case.

These appeals arise out of a breach of contract action involving the sale and development of 546 acres of the former Union Carbide Corporation (Union Carbide) corporate campus in Danbury (the Reserve). The primary brokers involved in the transactions were Jeanette Haddad (Haddad), a prominent local real estate agent who died in 2013, and Paul P. Scalzo.[2] The plaintiffs are Haddad's husband, Theodore Haddad, Sr., as executor of his wife's estate, and The Reserve Realty, LLC (Reserve Realty), a limited liability company organized by Haddad and Scalzo to market and sell the Reserve

---

[1] Such agreements may apply only to the initial sale/lease of the property, to all subsequent sales/leases that occur within a specified time frame, or in perpetuity.

[2] Haddad operated under the business name "Jeanette Haddad, Broker," and Scalzo operated through his real estate franchise, Century 21 Scalzo Realty, Inc. (Scalzo Realty). For simplicity, we do not distinguish between those individuals and their corporate entities in this opinion, referring to them, respectively, as "Haddad" and "Scalzo." We note that, subsequent to the filing of their action, Scalzo Realty was added as a necessary party but thereafter was defaulted for failure to plead. Subsequently, the plaintiffs withdrew their action as to Scalzo Realty.

Reserve Realty, LLC *v.* Windemere Reserve, LLC

as it became subdivided. The defendants, BLT Reserve, LLC (BLT), and Windemere Reserve, LLC (Windemere), are limited liability companies, the principals and owners of which include Carl R. Kuehner, Jr., and Paul J. Kuehner, whose family is longtime friends and business associates of the Haddad family. In this action, the plaintiffs sought to recover real estate brokerage fees in connection with the sale and/or lease of units in an apartment complex constructed on the Reserve and leased by BLT, and of commercial office space to be constructed on the Reserve by Windemere. After a trial to the court, judgments were rendered in favor of the defendants. The Appellate Court affirmed, agreeing with the trial court that the defendants' antitrust special defense barred the plaintiffs' claims. *Reserve Realty, LLC* v. *Windemere Reserve, LLC*, 174 Conn. App. 130, 132, 165 A.3d 162 (2017).

I

The relevant facts, as found by the trial court or that are undisputed, and complete procedural history are set forth in detail in the opinion of the Appellate Court. See id., 132–38. In brief, following its acquisition by the Dow Chemical Company (Dow Chemical) in 1999, Union Carbide made known that it would entertain offers to sell the Reserve to interested buyers. Garland Warren, then a Union Carbide employee, initially was responsible for overseeing the sale of the parcel.

In early 2002, a group of real estate developers, later known as Woodland Group II, LLC (Woodland), engaged the services of Haddad and Scalzo to represent them in negotiations to purchase the Reserve. Woodland appears to have chosen Haddad and Scalzo in part because Warren had since left Dow Chemical and been employed by Scalzo.

As part of the broker-client relationship, Haddad, Scalzo, and Woodland executed an "Exclusive Right to

Sell—Listing Agreement'' (Woodland agreement). The Woodland agreement gave Haddad and Scalzo the exclusive right to sell and/or lease property in the Reserve. The agreement also contained the following provision: ''[Woodland] shall make aware to the new purchaser of any part, or of individual lots, or of land, that this [a]greement shall apply to that new purchaser and [Haddad and Scalzo].''

Woodland succeeded in purchasing the Reserve, and the plaintiffs received a commission for facilitating that sale. Woodland subsequently proposed a master plan for the entire 546 acre parcel, which the Danbury Zoning Commission approved in November, 2002. Woodland then continued to use the services of Haddad and Scalzo to market the property to potential buyers.

Efforts to develop the property foundered, however, when Windemere, which was in the process of developing a neighboring parcel of land, appealed Woodland's zoning approval for the Reserve, effectively blocking development of the land. To resolve the zoning dispute, Woodland agreed to sell one portion of the Reserve (parcel 13) to BLT for residential development (a luxury apartment complex, Abbey Woods, had been built at the time of trial), and another portion (parcel 15) to Windemere for commercial development (which had yet to be built at the time of trial).

Consistent with the requirements of the Woodland agreement, and after several rounds of negotiations with Woodland, the defendants reluctantly agreed to include list-back provisions in their purchase and sale agreements for parcels 13 and 15. Specifically, BLT agreed to enter into a listing agreement with Haddad and Scalzo, pursuant to which the brokers would receive a 3 percent commission on the subsequent sale or lease of parcel 13, either as a whole or as individual units. For its part, Windemere agreed to pay Haddad

Reserve Realty, LLC *v.* Windemere Reserve, LLC

and Scalzo \$1 million for their efforts in leasing the office space that Windemere planned to build on parcel 15. That fee was to be paid in ten annual increments of \$100,000, beginning when the first certificate of occupancy was issued.[3] After months of additional negotiations, Woodland and the defendants finalized and memorialized those list-back agreements in July, 2003.[4]

Although Haddad and Scalzo made good faith efforts to market parcels 13 and 15, the real estate market softened in the wake of the 2007–2008 financial crisis, and those efforts were unsuccessful. BLT ultimately proceeded to build a luxury apartment complex on its parcel, units of which it marketed through its own on-site leasing agent instead of through the services of Haddad and Scalzo.

The plaintiffs responded by filing the present action, alleging breach of contract and anticipatory breach, and

---

[3] It is not entirely clear that the agreements governing parcel 15 are true list-back agreements. Although they include a reference to exclusive listing of that property, those agreements could plausibly be read to mean that the plaintiffs earned the \$1 million commission on the completion of the sale of that parcel by Woodland to Windemere, on the basis of the plaintiffs' role in facilitating that sale, and that payment was simply to be delayed until Windemere was able to develop the property. The trial court, for example, having found the parties' various purchase and listing agreements to be ambiguous, concluded that one possible interpretation of the agreements was that the plaintiffs had earned a commission with respect to parcel 15 prior to having performed any services for Windemere. Should these cases ultimately return to the trial court, it will fall to that court to determine whether those agreements are list-back agreements, the enforcement of which potentially implicates antitrust considerations or, rather, merely consideration for the plaintiffs' prior services. Compare, e.g., *Kaiser Steel Corp.* v. *Mullins*, 455 U.S. 72, 81–82, 102 S. Ct. 851, 70 L. Ed. 2d 833 (1982) (illegality defense should be entertained in those circumstances in which its rejection would be to enforce conduct forbidden by antitrust law), with *Kelly* v. *Kosuga*, 358 U.S. 516, 521, 79 S. Ct. 429, 3 L. Ed. 2d 475 (1959) (rejecting illegality defense when judgment would not have enforced allegedly illegal aspect of contract).

[4] The precise terms of the various contract documents vary, and are ambiguous, in ways that are not directly relevant to the legal issues now before us but that likely will need to be addressed on remand.

Reserve Realty, LLC *v.* Windemere Reserve, LLC

seeking, inter alia, specific performance of the listing agreements. In response, the defendants raised a number of special defenses, three of which were at issue in the plaintiffs' appeal to the Appellate Court. Specifically, the defendants argued that the list-back provisions in their purchase and sale agreements were not enforceable by the plaintiffs because those provisions (1) were illegal tying arrangements, (2) did not satisfy the requirements of General Statutes § 20-325a,[5] and (3) were personal and specific to Haddad, who died prior to the trial. *Reserve Realty, LLC* v. *Windemere Reserve, LLC*, supra, 174 Conn. App. 138. Following a bench trial, the trial court ruled for the defendants on all three of these special defenses and rendered judgments accordingly. The Appellate Court affirmed the judgments on the basis of the antitrust defense and, therefore, declined to address the plaintiffs' claims that the trial court reached the incorrect conclusion on the remaining special defenses.[6] Id.

II

The dispositive question in these appeals is whether we should reconsider our tying jurisprudence and overrule *Hossan-Maxwell, Inc*. In part II A of this opinion, we set forth certain well established background principles on which we understand the parties to be in agreement. In part II B and C, we address the legal questions that remain the subject of dispute between the parties.

A

The defendants' first special defense alleges that the list-back provisions in the parties' purchase and sale agreements violate the Sherman Act, 15 U.S.C. § 1 et

---

[5] Among other things, § 20-325a places certain restrictions on the ability of a real estate broker to bring an action to recover commissions arising out of a real estate transaction.

[6] In order for the plaintiffs to prevail, all three of these defenses must fail on appeal.

Reserve Realty, LLC *v.* Windemere Reserve, LLC

seq., and are, therefore, unenforceable. See *Kaiser Steel Corp.* v. *Mullins*, 455 U.S. 72, 76, 102 S. Ct. 851, 70 L. Ed. 2d 833 (1982) (claim that agreement "was void and unenforceable as violative of §§ 1 and 2 of the Sherman Act"); see also *Hanks* v. *Powder Ridge Restaurant Corp.*, 276 Conn. 314, 326, 885 A.2d 734 (2005) ("contracts that violate public policy are unenforceable" (internal quotation marks omitted)). The section of the Sherman Act at issue provides in relevant part: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several [s]tates, or with foreign nations, is declared to be illegal. . . ." 15 U.S.C. § 1 (2018). Although this provision, on its face, prohibits *any* contract in restraint of trade, the United States Supreme Court has added a judicial gloss requiring a contractual restraint to be unreasonable before it will be deemed illegal under the Sherman Act.[7] See, e.g., *Board of Trade* v. *United States*, 246 U.S. 231, 238–41, 38 S. Ct. 242, 62 L. Ed. 683 (1918);

---

[7] More broadly, this provision of the Sherman Act, which is only a few sentences long, is understood effectively to delegate to the courts the authority to determine what constitutes an unreasonable restraint of trade and, therefore, an antitrust violation. See *In re Cox Enterprises, Inc.*, 871 F.3d 1093, 1097 (10th Cir. 2017). As a result, although antitrust actions and defenses technically are statutory, judicial decisions interpreting and applying the Sherman Act tend to analyze antitrust issues more like common-law questions, with public policy and economic concerns at the forefront, rather than according to traditional methods of statutory construction. See R. Posner, "The Meaning of Judicial Self-Restraint," 59 Ind. L.J. 1, 5–6 (1983); see also 2 P. Areeda & H. Hovenkamp, Antitrust Law (3d Ed. 2007) ¶ 301a, pp. 6–7.

We further note that, to the extent that the trial court read General Statutes § 35-26 literally to prohibit any "contract, combination, or conspiracy in restraint of any part of trade or commerce"; see footnote 8 of this opinion; that court's reading was incorrect. Every commercial contract, by definition, constitutes a restraint of trade. *Procaps S.A.* v. *Patheon, Inc.*, 845 F.3d 1072, 1081 (11th Cir. 2016). If a dog breeder contracts to sell three puppies to a family, commerce in those three puppies is restrained, insofar as no other customer may purchase them. The antitrust laws proscribe only those contracts that *unreasonably* restrain trade. See, e.g., id.; *Tremont Public Advisors, LLC* v. *Connecticut Resources Recovery Authority*, 333 Conn. 672, 695, 217 A.3d 953 (2019).

*Elida, Inc.* v. *Harmor Realty Corp.*, 177 Conn. 218, 225, 413 A.2d 1226 (1979); see also *Bridgeport Harbour Place I, LLC* v. *Ganim*, 303 Conn. 205, 214, 32 A.3d 296 (2011) ("an act is deemed anticompetitive under the Sherman Act only when it harms both allocative efficiency and raises the prices of goods above competitive levels or diminishes their quality" (emphasis omitted; internal quotation marks omitted)).

The United States Supreme Court generally has reviewed alleged Sherman Act violations under one of two standards. "If a restraint alleged is among that small class of actions that courts have deemed to have . . . predictable and pernicious anticompetitive effect, and . . . limited potential for procompetitive benefit, it will be unreasonable per se . . . . Most antitrust claims, however . . . are analyzed under a rule of reason analysis [that] seeks to determine if the alleged restraint is unreasonable because its anticompetitive effects outweigh its procompetitive effects." (Internal quotation marks omitted.) *Bridgeport Harbour Place I, LLC* v. *Ganim*, supra, 303 Conn. 214–15.

Treating some practices as illegal per se allows courts to recognize and efficiently resolve disputes concerning practices that have little or no positive economic value and are highly likely to be anticompetitive, without the need for parties to engage in costly and complex litigation centering around competing expert testimony. See 9 P. Areeda & H. Hovenkamp, Antitrust Law (3d Ed. 2011) ¶ 1720a, pp. 260–61. On the other hand, presumptively applying a rule of reason to most alleged antitrust violations (1) respects the freedom of competitors and consumers to structure their economic relations as they see fit, (2) recognizes that courts generally are ill-equipped to identify those business practices that deviate from the procompetitive norm and may be too quick to choose economic winners and losers rather than allowing the marketplace to sort things out, and (3) requires proof that a challenged business practice actu-

Reserve Realty, LLC *v.* Windemere Reserve, LLC

ally imposes an unreasonable restraint on trade before exposing a defendant to potential antitrust liability. See 7 P. Areeda & H. Hovenkamp, Antitrust Law (3d Ed. 2010) ¶ 1500, pp. 379–82; 9 P. Areeda & H. Hovenkamp, supra, ¶ 1710c, pp. 110–13.

In addition to the Sherman Act, the defendants allege that the list-back provisions in their agreements also violate the Connecticut Antitrust Act, General Statutes § 35-24 et seq. The primary allegation is that the list-back provisions violate General Statutes § 35-26,[8] the state analogue of 15 U.S.C. § 1.[9] It is well established that the state antitrust act was patterned after federal antitrust law. *Bridgeport Harbour Place I, LLC* v. *Ganim*, supra, 303 Conn. 213 n.6. Indeed, General Statutes § 35-44b provides that, in construing the antitrust act, "the courts of this state shall be guided by interpretations given by the federal courts to federal antitrust statutes." For this reason, "we follow federal precedent when we interpret the [Connecticut Antitrust Act] unless the text of our antitrust statutes, or other pertinent state law, requires us to interpret it differently . . . ." (Internal quotation marks omitted.) *Bridgeport Harbour Place I, LLC* v. *Ganim*, supra, 213 n.6; see also *Westport Taxi Service, Inc.* v. *Westport Transit District*, 235 Conn. 1, 15–16, 664 A.2d 719 (1995). Insofar

---

[8] General Statutes § 35-26 provides: "Every contract, combination, or conspiracy in restraint of any part of trade or commerce is unlawful."

[9] The parties disagree as to whether the defendants' antitrust special defense also can be understood to allege a violation of General Statutes § 35-29, the state analogue of § 3 of the Clayton Act, 15 U.S.C. § 14. Because we conclude that tying arrangements are evaluated under the same legal standard under both the Sherman Act and the Clayton Act, we need not resolve this dispute. See part III C of this opinion. Moreover, although the defendants correctly note that § 35-29 is broader in scope than § 3 of the Clayton Act—insofar as the former statute, unlike the latter, (1) applies to anticompetitive conduct in the provision of services as well as commodities, and (2) is not limited to interstate commerce—the defendants do not contend that anything in the text or history of § 35-29 warrants the application of a different legal *standard.*

Reserve Realty, LLC *v.* Windemere Reserve, LLC

as neither party contends that § 35-26 should be interpreted differently from its federal counterpart, we limit our analysis herein to the issue of whether the listing agreements violate 15 U.S.C. § 1.

The defendants allege that the agreements at issue in the present case are illegal tying arrangements. "A tying arrangement is an agreement by a party to sell one product [the tying product] but only on the condition that the buyer also purchase a different (tied) product, or at least agree that he will not purchase that product from any other supplier." *State* v. *Hossan-Maxwell, Inc.*, supra, 181 Conn. 659. In its early antitrust cases, the United States Supreme Court took a dim view of tying arrangements because it assumed that (1) tying confers little, if any, economic benefit or value, and (2) tying allows a monopolist in the tying product to improperly extend or leverage its monopoly position so as to monopolize or obtain an unfair advantage in the market for the complementary, tied product (the dual monopoly profit theory). See *Illinois Tool Works, Inc.* v. *Independent Ink, Inc.*, 547 U.S. 28, 35, 126 S. Ct. 1281, 164 L. Ed. 2d 26 (2006). Because tying was viewed as being almost invariably anticompetitive, the Supreme Court initially classified tying among those trade practices deemed per se unlawful. See, e.g., *Times-Picayune Publishing Co.* v. *United States*, 345 U.S. 594, 609, 73 S. Ct. 872, 97 L. Ed. 1277 (1953).

The issue of the legality of broker list-back agreements under federal and state antitrust law first arose in the late 1970s and early 1980s. Consistent with the United States Supreme Court's then prevailing views on tying arrangements, both this court and our sister courts[10] held such arrangements to be per se illegal

---

[10] See, e.g., *Miller* v. *Granados*, 529 F.2d 393, 396–97 (5th Cir. 1976); *MacManus* v. *A. E. Realty Partners*, 146 Cal. App. 3d 275, 288, 194 Cal. Rptr. 567 (1983); *King City Realty, Inc.* v. *Sunpace Corp.*, 291 Or. 573, 581, 633 P.2d 784 (1981); see also *In re Real Estate Litigation*, 95 Wn. 2d 297, 301–304, 622 P.2d 1185 (1980) (addressing jurisdictional issues).

Reserve Realty, LLC *v.* Windemere Reserve, LLC

and, therefore, generally refused to enforce contracts predicated on such an agreement.

We addressed this issue in *Hossan-Maxwell, Inc.* A brief review of the facts of that case is instructive. In 1966, James F. Hartnett recorded a declaration of covenants and restrictions on certain parcels of residential land in New Milford. *State* v. *Hossan-Maxwell, Inc.*, supra, 181 Conn. 657. That declaration required that a grantee of any of the sixty-four building lots who decided to sell or lease the property through any commissioned broker give exclusive sales and leasing rights to Hartnett for a period of three months. Id., 658. These exclusive rights were intended to run with the land and to bind not only the immediate grantee but all subsequent purchasers. Id. Apparently, Hartnett intended to charge a 6 percent commission for his services, which was consistent with the prevailing market rate. Id., 663, 665 n.7.

In affirming the trial court's judgment declaring the restrictive covenants unenforceable, this court applied not a true per se rule but, rather, the "quasi-per se" rule that the United States Supreme Court articulated in *Northern Pacific Railway Co.* v. *United States*, 356 U.S. 1, 78 S. Ct. 514, 2 L. Ed. 2d 545 (1958) (*Northern Pacific*). See *State* v. *Hossan-Maxwell, Inc.*, supra, 181 Conn. 660–67. Under the *Northern Pacific* rule, a tying arrangement violates 15 U.S.C. § 1, without the need to demonstrate any anticompetitive effects—that is, without the need for a full rule of reason analysis—if the following conditions are met: (1) the seller has sufficient economic power with respect to the tying product to appreciably restrain free competition in the market for the tied product, and (2) a "not insubstantial amount of interstate commerce is affected," meaning that more than a de minimis volume of business is foreclosed to competitors by the tie. See id., 661–63.

Reserve Realty, LLC *v.* Windemere Reserve, LLC

With respect to the first prong of the *Northern Pacific* rule, economic power for antitrust purposes ordinarily must be demonstrated by proving that a seller has a substantial or dominant position (market power) in a defined product and geographic market. See, e.g., *Smugglers Notch Homeowners' Assn., Inc.* v. *Smugglers' Notch Management Co., Ltd.*, 414 Fed. Appx. 372, 375 (2d Cir. 2011); see also footnote 14 of this opinion. Several United States Supreme Court cases decided prior to *Hossan-Maxwell, Inc.*, however, held that economic power also can be established merely by demonstrating that the tying product at issue is protected as intellectual property or is a unique or especially desirable item, the assumption being that that uniqueness of the tying product can be leveraged to compel an eager buyer to accept the tied product.[11] See, e.g., *International Salt Co.* v. *United States*, 332 U.S. 392, 395–96, 68 S. Ct. 12, 92 L. Ed. 20 (1947); *International Business Machines Corp.* v. *United States*, 298 U.S. 131, 135–37, 56 S. Ct. 701, 80 L. Ed. 1085 (1936); see also *Jefferson Parish Hospital District No. 2* v. *Hyde*, 466 U.S. 2, 17, 104 S. Ct. 1551, 80 L. Ed. 2d 2 (1984) ("when the seller offers a unique product that competitors are not able to offer . . . [this] [c]ourt has held that the likelihood that market power exists and is being used to restrain competition in a separate market is sufficient to make per se condemnation appropriate" (citation omitted)). In *State* v. *Hossan-Maxwell, Inc.*, supra, 181 Conn. 665, this court read *Northern Pacific* to mean that land—or at least residential land—also is

---

[11] Although courts sometimes use the terms "economic power" and "market power" interchangeably, in this opinion, for clarity, we use the term "economic power" in the more general sense to encompass all of the various factors that courts have indicated may satisfy the first prong of *Northern Pacific*. These include not only market power (a substantial or dominant share of a defined, distinct market), but also uniqueness, special desirability, a legal monopoly such as a patent, and anything else that might permit a seller to force a buyer to agree to acquire an unwanted tied product.

Reserve Realty, LLC *v.* Windemere Reserve, LLC

always unique. Accordingly, a landowner who ties the sale of their land to the purchase of another product or service necessarily has market power for purposes of a court's evaluation of an antitrust challenge. See id.

This court also concluded in *Hossan-Maxwell, Inc.*, that the second prong of the *Northern Pacific* rule was satisfied because, under what the court described as its "very liberal interpretation" of *Northern Pacific*, the estimated $21,000 in annual real estate commissions implicated by the declaration constituted a not insubstantial volume of business that was foreclosed to other brokers. (Internal quotation marks omitted.) Id., 664.

In the four decades since this court held in *Hossan-Maxwell, Inc.*, that any real estate list-back agreement affecting more than a de minimis volume of commerce is per se illegal, neither this court nor, to our knowledge, any federal appellate court has had the opportunity to consider the ongoing vitality of that rule. Although, in addressing this question, we must defer to the trial court's factual findings, our interpretation of federal and state antitrust laws is plenary. See, e.g., *Miller's Pond Co., LLC* v. *New London*, 273 Conn. 786, 798, 873 A.2d 965 (2005); *Westport Taxi Service, Inc.* v. *Westport Transit District*, supra, 235 Conn. 14–15.

B

We turn now to the primary issue presented by the present appeals, namely, whether the reasoning and result of this court's decision in *Hossan-Maxwell, Inc.*, remain consistent with the current views of the United States Supreme Court and the lower federal courts with respect to tying arrangements. The plaintiffs posit that *Hossan-Maxwell, Inc.*, has been vitiated by modern antitrust case law or, at the very least, that we should adopt a more nuanced approach to tying arrangements such as that espoused by Justice O'Connor in her concurring opinion in *Jefferson Parish Hospital District*

Reserve Realty, LLC *v.* Windemere Reserve, LLC

*No. 2* v. *Hyde*, supra, 466 U.S. 33–42. The defendants respond that *Hossan-Maxwell, Inc.*, remains fully consistent with controlling United States Supreme Court precedent and, therefore, should not be overruled. Because we conclude that the trajectory of federal antitrust law, as informed by recent antitrust scholarship, clearly is diverging from the traditional per se treatment of tying arrangements, we agree with the plaintiffs that the trial court should not have found the list-back agreements at issue in this case unenforceable without first engaging in a full market analysis.

1

Before we review the evolution of the United States Supreme Court's tying jurisprudence, it will be instructive briefly to review some of the developments in antitrust scholarship that precipitated that evolution. Tying was among the first areas in which modern antitrust theory—often associated with the so-called "law and economics" or "Chicago school" of thought—diverged from courts' traditional approach to competition problems. Beginning in the 1970s, antitrust scholars began to challenge the two pillars that had supported courts' per se treatment of tying arrangements, namely, the dual monopoly profit theory and the axiom that tying typically confers no economic benefit or value. Scholars theorized—and purported to demonstrate—that, far from being inherently anticompetitive, most tying agreements are actually procompetitive.[12] See, e.g., D. Carlton & M. Waldman, "Robert Bork's Contributions

---

[12] A tying arrangement, such as requiring that consumers purchase laces in tandem with a new pair of shoes or commit to buying a vendor's paper when purchasing its photocopy machines, might, for example, result in increased efficiencies, satisfy consumer preferences for bundled sales, protect a seller's good will, or facilitate economically desirable forms of price discrimination. See, e.g., 9 P. Areeda & H. Hovenkamp, supra, ¶ 1703g, pp. 51–54; id., ¶ 1720, pp. 259–61; D. Carlton & M. Waldman, "Robert Bork's Contributions to Antitrust Perspectives on Tying Behavior," 57 J.L. & Econ. S121–26 (2014).

Reserve Realty, LLC *v.* Windemere Reserve, LLC

to Antitrust Perspectives on Tying Behavior,'' 57 J.L. & Econ. S121, S121–22 (2014); R. Posner, ''The Chicago School of Antitrust Analysis,'' 127 U. Pa. L. Rev. 925, 925–26 (1979). They also established that, in most instances, control over a tying product does not allow a monopolist to garner additional profits by cornering the market for a tied product. See, e.g., *Scheiber* v. *Dolby Laboratories, Inc.*, 293 F.3d 1014, 1020 (7th Cir. 2002) (''as [modern] cases and a tidal wave of legal and economic scholarship point out, the idea that you can use tying to lever your way to a second . . . monopoly is economic nonsense''), cert. denied, 537 U.S. 1109, 123 S. Ct. 853, 154 L. Ed. 2d 781 (2003).

At a more fundamental level, recent scholarship has highlighted the difficulty in distinguishing between a packaged sale that is a tie—and, thus, presumptively illegal under traditional antitrust jurisprudence—and a product or service *bundle*, which is presumptively legal and consumer friendly. As one author has explained, ''[t]he most robust statement one can make about tying is that it is ubiquitous. Consider the following examples: shoes are sold in pairs; hotels sometimes offer break-fast, lunch or dinner tied with the room; there is no such a thing as an unbundled car; and no self-respecting French restaurant would allow its patrons to drink a bottle of wine not coming from its cellar.'' C. Ahlborn et al., ''The Antitrust Economics of Tying: A Farewell to Per Se Illegality,'' 49 Antitrust Bull. 287, 287 (2004); see also K. Hylton & M. Salinger, ''Tying Law and Policy: A Decision-Theoretic Approach,'' 69 Antitrust L.J. 469, 526 (2001) (''tying is so pervasive even in competitive markets that there is ample evidence that procompetitive tying is a common occurrence'').

Finally, antitrust scholars have cautioned against the use of tying law to resolve ''contract dispute[s] in which one side got the benefit of the bargain and then sought to have the contract declared a violation of the Sherman

Reserve Realty, LLC *v.* Windemere Reserve, LLC

Act.'' K. Hylton & M. Salinger, "Reply to Grimes: Illusory Distinctions and Schisms in Tying Law,'' 70 Antitrust L.J. 231, 239 (2002); see also *Hemlock Semiconductor Operations, LLC* v. *SolarWorld Industries Sachsen GmbH*, 867 F.3d 692, 701 (6th Cir. 2017) ("illegality defenses based on antitrust law are disfavored, especially when allowing the defense would let the buyer escape from its side of a bargain after having received a benefit'' (internal quotation marks omitted)). See footnote 3 of this opinion.

2

In the four decades since this court decided *Hossan-Maxwell, Inc.*, the foregoing scholarship has prompted the United States Supreme Court to rethink its approach to tying claims. In *Jefferson Parish Hospital District No. 2* v. *Hyde*, supra, 466 U.S. 32–33, Justice O'Connor authored a concurring opinion, joined by three other members of the court, in which she argued that the tying arrangements at issue—patients obtaining surgery at the defendant hospital were required to use a designated anesthesiology practice—should be evaluated under the rule of reason. More generally, the concurrence, citing to recent antitrust scholarship, argued that "[t]he time has . . . come to abandon the 'per se' label and refocus the inquiry on the adverse economic effects, and the potential economic benefits, that the tie may have."[13] Id., 35 (O'Connor, J., concurring in the judgment). Although a majority of the court continued to apply the *Northern Pacific* quasi-per se rule to tying

---

[13] Justice O'Connor's concurring opinion went so far as to argue that tying arrangements should be deemed presumptively *legal*, unless (1) the seller has market power in the tying product market, (2) there is "a substantial threat that the tying seller will acquire market power in the [tied product] market," and (3) the tied product is one that some consumers might wish to purchase separately without also purchasing the tying product. *Jefferson Parish Hospital District No. 2* v. *Hyde*, supra, 466 U.S. 37–39. If all three conditions are met, then the antitrust claims would be evaluated under a rule of reason analysis. Id.

Reserve Realty, LLC *v.* Windemere Reserve, LLC

claims in its next tying case; see *Eastman Kodak Co.* v. *Image Technical Services, Inc.*, 504 U.S. 451, 462, 112 S. Ct. 2072, 119 L. Ed. 2d 265 (1992); the dissent, penned by Justice Scalia and joined by Justices O'Connor and Thomas, again recognized the "intense criticism of the [court's] tying doctrine in academic circles . . . ." Id., 487.

Finally, in *Illinois Tool Works, Inc.*, a majority of the Supreme Court for the first time expressly repudiated the court's traditional disapproval of tying agreements. Justice Stevens, writing for a unanimous court, undertook "a fresh examination of the history of both the judicial and legislative appraisals of tying arrangements . . . informed by extensive scholarly comment and a change in position by the administrative agencies charged with enforcement of the antitrust laws." (Citation omitted.) *Illinois Tool Works Inc.* v. *Independent Ink, Inc.*, supra, 547 U.S. 33. The court observed that, "[o]ver the years . . . [its] strong disapproval of tying arrangements has substantially diminished. Rather than relying on assumptions, in its more recent opinions the [c]ourt has required a showing of market power in the tying product." Id., 35. Justice Stevens further explained that, whereas the court traditionally had been of the view that "[t]ying arrangements serve hardly any purpose beyond the suppression of competition," that view had evolved with the recognition that "tying arrangements may well be procompetitive . . . ." (Internal quotation marks omitted.) Id., 35–36.

Having thus framed the issue, the court in *Illinois Tool Works, Inc.*, proceeded to expressly overrule one "vestige of [its] historical distrust of tying arrangements . . . ." Id., 38. As we discussed, in previous decisions, the United States Supreme Court had indicated that the first prong of the *Northern Pacific* rule—possession of economic power in the tying product—can be established not only by proving that a seller holds a dominant

Reserve Realty, LLC *v.* Windemere Reserve, LLC

position in a defined market for the tying product, but also by demonstrating that the tying product is presumed to be uniquely desirable. In *Northern Pacific* itself, the court suggested that the unique configuration and choice location of the defendant's land was sufficient to confer economic power. *Northern Pacific Railway Co.* v. *United States*, supra, 356 U.S. 7; see also id., 16–20 (Harlan, J., dissenting). In prior decisions, the court had likewise held that the monopoly conferred by a patent presumptively confers market power for purposes of a tying claim. See, e.g., *International Salt Co.* v. *United States*, supra, 332 U.S. 395–96; *International Business Machines Corp.* v. *United States*, supra, 298 U.S. 136–37. Indeed, it was in the context of intellectual property that the Supreme Court initially held that tying arrangements are per se illegal. See *Illinois Tool Works, Inc.* v. *Independent Ink, Inc.*, supra, 547 U.S. 33.

In *Illinois Tool Works, Inc.*, the issue was whether the court should depart from its long established rule that a patent holder presumptively exerts market power over the patented product for purposes of a tying allegation. Id., 31. Overruling several of its prior tying decisions; see id., 38–40; the court held that "the mere fact that a tying product is patented does not support . . . a presumption [of market power]." Id., 31. The court emphasized that its new approach, which requires proof that the seller holds market power in the relevant market, is consistent with "the vast majority of academic literature on the subject." Id., 43–44 and n.4.

3

The parties to the present case disagree as to the scope of the Supreme Court's decision in *Illinois Tool Works, Inc.* The defendants contend that its holding was limited to patented products, whereas the plaintiffs contend that the court intended to depart more fundamentally from its prior view that the uniqueness of a

Reserve Realty, LLC *v.* Windemere Reserve, LLC

tying product can presumptively establish economic power for purposes of *Northern Pacific*. The narrow reading advocated by the defendants is consistent with the fact that only the question of patents was before the court in *Illinois Tool Works, Inc.*, and that the court, in overruling its prior patent tying cases, relied on various factors that are specific to the patent context: recent congressional amendments to the patent misuse statutes, new guidance from the federal agencies charged with the enforcement of the antitrust laws, and the views of antitrust scholars regarding the overlap of intellectual property and antitrust law. Id., 41–45.

The plaintiffs' broader reading of *Illinois Tool Works, Inc.*, however, finds support in the manner in which the Supreme Court framed its holding, which appeared to extend beyond the patent context. "Many tying arrangements," the court wrote, "even those involving patents and requirements ties, are fully consistent with a free, competitive market. . . . Congress, the antitrust enforcement agencies, and most economists have all reached the conclusion that a patent does not necessarily confer market power upon the patentee. Today, we reach the same conclusion and therefore hold that, *in all cases involving a tying arrangement*, the plaintiff must prove that the defendant has market power in the tying product." (Citations omitted; emphasis added.) Id., 45–46. The fact that the Supreme Court's restrictive tying jurisprudence originated in the patent context also suggests that that court's recent change of direction with respect to the tying of patented products evinces a broader rethinking of tying generally. Indeed, it would be odd if the Supreme Court were to conclude that holding a patent—a legal monopoly—over a product is not sufficient to confer economic power but that mere ownership of a parcel of land, without more, is sufficient.

Reserve Realty, LLC *v.* Windemere Reserve, LLC

Our impression that the plaintiffs have the better of this argument is reinforced by the fact that most of the lower federal courts and our sister state courts that have considered the question have adopted the broader reading of *Illinois Tool Works, Inc.*, and interpreted the decision to mean that the uniqueness of a tying product no longer gives rise to a presumption of economic power. Market power in a defined product and geographic market must be established to satisfy the first prong of *Northern Pacific*, even with respect to unique, nonpatented tying products such as land.[14]

In *Michigan Division-Monument Builders of North America* v. *Michigan Cemetery Assn.*, 458 F. Supp. 2d 474, 476–77 (E.D. Mich. 2006), aff'd, 524 F.3d 726 (6th Cir. 2008), the plaintiffs, a class of independent monument dealers, alleged that the defendant cemeteries violated the Sherman Act by requiring that consumers who wished to buy a burial plot also to purchase monuments and related services from the cemetery. They alleged that this tying scheme was per se illegal because the uniqueness of burial land meant that each cemetery constituted a distinct product and geographic market. Id., 477. The federal District Court, granting the defen-

---

[14] We note that defining a relevant product and geographic market for purposes of the federal antitrust laws is a highly technical process that typically requires expert testimony. See, e.g., *McWane, Inc.* v. *Federal Trade Commission*, 783 F.3d 814, 829 (11th Cir. 2015), cert. denied,    U.S.    , 136 S. Ct. 1452, 194 L. Ed. 2d 550 (2016); *Hynix Semiconductor, Inc.* v. *Rambus, Inc.*, Docket No. CV-00-20905 RMW, 2008 WL 73689, *10 n.13 (N.D. Cal. January 5, 2008). The most common test of a proposed market definition asks whether there is sufficient cross-elasticity of demand that a small but significant and nontransitory price increase will lead customers to look elsewhere—both productwise and geographically—for substitutes. See, e.g., *DSM Desotech, Inc.* v. *3D Systems Corp.*, 749 F.3d 1332, 1339–40 (2014); *Theme Promotions, Inc.* v. *News America Marketing FSI*, 546 F.3d 991, 1002 (2008). Only once the relevant product and geographic markets have been carefully defined can the trier of fact assess the relevant antitrust variables, whether it be market share, economic power, market concentration, barriers to entry, or the like.

Reserve Realty, LLC *v.* Windemere Reserve, LLC

dants' motion to dismiss the tying claims, concluded that the alleged relevant geographic market—each individual cemetery—failed as a matter of law. Id., 480–85. The court reached that conclusion because, in its view, "the reasoning in [*Illinois Tool Works, Inc.*] makes it clear that presumptions, whether based on the uniqueness of a patent or the uniqueness of land, cannot support a valid antitrust claim." Id., 484.

The United States Court of Appeals for the Sixth Circuit affirmed, opining that, under *Illinois Tool Works, Inc.*, "[t]he idea that all land is unique . . . is insufficient to support a finding of market power." *Michigan Division-Monument Builders of North America* v. *Michigan Cemetery Assn.*, supra, 524 F.3d 732. The Court of Appeals distinguished the holding of *Northern Pacific*, concluding that, in that case, the Supreme Court had affirmed a finding of economic power not because commercial land in general is unique but, rather, because there was other evidence showing that the specific location of the land lent the seller a competitive advantage that others could not achieve. Id., 733. Specifically, the land at issue in *Northern Pacific* was strategically located in checkerboard fashion within economic distance of key transportation facilities and, therefore, was essential to the business activities of those who purchased or leased it. Id., 732–33; see *Northern Pacific Railway Co.* v. *United States*, supra, 356 U.S. 7.

In so holding, the Sixth Circuit joined several other appellate courts to have rejected—even prior to *Illinois Tool Works, Inc.*—the theory that the uniqueness of land, standing alone, is sufficient to create economic power for purposes of the first prong of the *Northern Pacific* rule. See, e.g., *Smugglers Notch Homeowners' Assn., Inc.* v. *Smugglers' Notch Management Co., Ltd.*, supra, 414 Fed. Appx. 376 (rejecting "unique geographic qualities of ski areas" as basis for finding of market

Reserve Realty, LLC *v.* Windemere Reserve, LLC

power (internal quotation marks omitted)); *Baxley-DeLamar Monuments, Inc.* v. *American Cemetery Assn.*, 938 F.2d 846, 851 (8th Cir. 1991) ("[A]ll land is unique, but the mere fact that the tying product is real estate does not convey market power. . . . In numerous other tying cases involving real estate as the tying product, courts have held that the real estate must have some particular strategic or competitive importance in order to carry market power." (Citations omitted.)); *McCormick* v. *Bradley*, 870 P.2d 599, 604–605 (Colo. App. 1993) (criticizing and declining to follow *Hossan-Maxwell, Inc.*), cert. denied, Colorado Supreme Court, Docket No. 93SC773 (April 11, 1994); *Vande Guchte* v. *Kort*, 13 Neb. App. 875, 887, 703 N.W.2d 611 (2005) ("we do not accept the notion that the 'uniqueness' of land by itself establishes economic power").

More generally, other federal courts have read *Illinois Tool Works, Inc.*, to broadly hold that market power in a defined product and geographic market *always* must be established to proceed under the quasi-per se rule in *Northern Pacific*. See, e.g., *Auraria Student Housing at the Regency, LLC* v. *Campus Village Apartments, LLC*, 843 F.3d 1225, 1246 (10th Cir. 2016); *Batson* v. *Live Nation Entertainment, Inc.*, 746 F.3d 827, 831–32 (7th Cir. 2014); *Sheridan* v. *Marathon Petroleum Co., LLC*, 530 F.3d 590, 593–94 (7th Cir. 2008); *Compliance Marketing, Inc.* v. *Drugtest, Inc.*, Docket No. 09-CV-01241-JLK, 2010 WL 1416823, *7 (D. Colo. April 7, 2010); *Mediacom Communications Corp.* v. *Sinclair Broadcast Group, Inc.*, 460 F. Supp. 2d 1012, 1027 (S.D. Iowa 2006). It seems clear, then, that a per se ban on list-back agreements, as applied in *Hossan-Maxwell, Inc.*, is inconsistent with federal antitrust law as it has evolved over the past several decades.[15]

_____

[15] Indeed, given the recent evolution of the tying doctrine in the federal courts, it is fair to ask whether the *Northern Pacific* rule, in its present form, should continue to be considered a per se prohibition on tying in any sense. See, e.g., 9 P. Areeda & H. Hovenkamp, supra, ¶ 1728c, pp. 375–76 (explaining that most lower courts now allow defendants to raise defense

Reserve Realty, LLC *v.* Windemere Reserve, LLC

C

We next consider three arguments offered by the defendants that have not been fully addressed by the preceding discussion. First, the defendants contend that their antitrust special defense invokes not only the Sherman Act and its state analogues but also General Statutes § 35-29, the Connecticut analogue of § 3 of the Clayton Act, 15 U.S.C. § 14. The point matters, they contend, because, in *Hossan-Maxwell, Inc.*, this court, following what appeared at that time to be the guidance of the United States Supreme Court in *Times-Picayune Publishing Co.* v. *United States*, supra, 345 U.S. 594, concluded that tying claims brought under the Clayton Act or its state analogue need to satisfy only one prong of the rule set forth in *Northern Pacific*. See *State* v. *Hossan-Maxwell, Inc.*, supra, 181 Conn. 662. That is, a tie could be deemed illegal per se merely on the basis of the fact that it foreclosed a not insubstantial volume of trade in the tied product, even if the seller lacked economic power in the tying product market. If that were the case, then the analysis in part II B of this opinion, which addresses only the first prong of the *Northern Pacific* rule, would likely be moot, insofar as the plaintiffs do not dispute that a substantial volume of trade is at issue.

that tying arrangement is affirmatively justified by fact that it confers benefits not available by alternative means); E. Elhauge, "Tying, Bundled Discounts, and the Death of the Single Monopoly Profit Theory," 123 Harv. L. Rev. 397, 425–26 (2009) ("It . . . now seems likely that a tie can be justified by evidence that the tie is the least restrictive way to achieve efficiencies large enough to offset the anticompetitive effects. Accordingly, today it is more accurate to read Supreme Court precedent on tying as embracing a rule of reason, where anticompetitive effects must be shown or inferred and procompetitive justifications are admissible."); see also *United States* v. *Microsoft Corp.*, 253 F.3d 34, 84 (D.C. Cir.) (rule of reason, rather than per se analysis, governs legality of tying arrangements involving platform software products), cert. denied, 534 U.S. 952, 122 S. Ct. 350, 151 L. Ed. 2d 264 (2001).

Although that reading of *Times-Picayune Publishing Co.* was still considered plausible at the time that *Hossan-Maxwell, Inc.*, was decided, since then, the federal courts and antitrust scholars almost universally have concluded that the standard for tying claims brought under the Clayton Act is no different from the standard for those brought under the Sherman Act. See, e.g., *Sheridan* v. *Marathon Petroleum Co., LLC*, supra, 530 F.3d 592 ("[t]hough some old cases say otherwise, the standards for adjudicating tying under the two statutes are now recognized to be the same"); *De Jesus* v. *Sears, Roebuck & Co.*, 87 F.3d 65, 70 (2d Cir.) ("[W]e have required allegations and proof of five specific elements before finding a tie illegal . . . . These elements are common to claims asserted under either the Sherman or Clayton Acts." (Citation omitted; internal quotation marks omitted.)), cert. denied, 519 U.S. 1007, 117 S. Ct. 509, 136 L. Ed. 2d 399 (1996); *In re Data General Corp. Antitrust Litigation*, 490 F. Supp. 1089, 1100 (N.D. Cal. 1980) ("It was traditionally understood that a tying arrangement would run afoul of [the] Clayton [Act] if it satisfied . . . either . . . of the elements required under the Sherman Act. . . . Recently, however, the neat distinction between tying arrangements that violate [the] Sherman [Act] and those that violate [the] Clayton [Act] has faded beyond recognition." (Citation omitted.)); 2 P. Areeda & H. Hovenkamp, Antitrust Law, (3d Ed. 2007) ¶ 301c, pp. 9–11 and n.28 (referring to *Times-Picayune Publishing Co.* as "one obsolete exception" to prevailing view); H. Hovenkamp, "Tying Arrangements in the Real Estate Market: Federal Antitrust Law and Local Land Development Policy," 33 Hastings L.J. 325, 334 (1981) ("[s]ince *Times-Picayune* [*Publishing Co.*] was decided, [the] distinction between the [Sherman Act and the Clayton Act] has increasingly been disregarded"). Accordingly, we need not resolve the parties' dispute as to whether the defendants ade-

Reserve Realty, LLC *v.* Windemere Reserve, LLC

quately pleaded a violation of § 35-29, insofar as the same legal standard applies to tying claims under both federal acts and their state counterparts.

Second, the defendants contend that other courts that have considered the issue have agreed with *Hossan-Maxwell, Inc.*, that any list-back agreement that forecloses a not insubstantial volume of broker commissions is per se illegal. That appears to have been the consensus view in the late 1970s and early 1980s. See footnote 10 of this opinion and accompanying text. Although we have identified some contrary authority even from that time period,[16] the important point is that all of the cases on which the defendants rely were decided more or less contemporaneously with *Hossan-Maxwell, Inc.*, and well before the evolution in federal tying law that we discussed in part II B of this opinion. The fact that those cases were decided consistently with *Hossan-Maxwell, Inc.*, is, therefore, of little moment.

Third, the defendants emphasize that, regardless of whether *federal* antitrust law treats land as conferring economic power for purposes of the *Northern Pacific* rule, this court concluded in *Hossan-Maxwell, Inc.*, that land is inherently unique as a matter of Connecticut common law. They contend, therefore, that the logic of that decision remains sound regardless of whether federal law has taken a different direction.

---

[16] See, e.g., *Fran Welch Real Estate Sales, Inc.* v. *Seabrook Island Co.*, 621 F. Supp. 128, 137–38 (D.S.C. 1985) (summary judgment on real estate list-back claim deemed inappropriate when (1) relevant market had not been defined, and (2) six month exclusive listing agreement was likely too short to unreasonably restrain competition), aff'd, 809 F.2d 1030 (4th Cir. 1987); *Outdoor Resorts of America, Inc.* v. *Outdoor Resorts at Nettles Island, Inc.*, 379 So. 2d 471, 471–72 (Fla. App.) (rule of reason governed claim that purchase of recreational vehicle lot was tied to developer's exclusive right to rent lots at 50 percent commission when not in use), cert. denied, 388 So. 2d 1116 (Fla. 1980); see also *Vande Guchte* v. *Kort*, supra, 13 Neb. App. 887 (holding that builder tie-in contract, which conditioned sale of lot on use of specific builder, was not per se illegal).

It is true that, in *Hossan-Maxwell, Inc.*, our conclusion that the first prong of the *Northern Pacific* rule was satisfied rested in part on the fact that, "[i]n Connecticut, the uniqueness and special characteristics of a particular plot of land have long been recognized. *Anderson* v. *Yaworski*, 120 Conn. 390, 395, 399, 181 A. 205 [1935]." *State* v. *Hossan-Maxwell, Inc.*, supra, 181 Conn. 665. We agree with the plaintiffs, however, that this court's reliance on that principle, and on *Anderson*, was misplaced.

In *Anderson*, this court simply reiterated the well established principle that contracts for the sale of real estate usually may be specifically enforced because each parcel of land has its own particular characteristics such that a buyer may not consider an equivalently priced parcel to be an adequate substitute. *Anderson* v. *Yaworski*, supra, 120 Conn. 395. But the fact that a parcel of land is deemed to be unique for purposes of property and contract law has little, if anything, to do with whether it is unique for purposes of antitrust law. Antitrust law is concerned with whether a seller has economic power—the ability to sell a product at a supracompetitive price—which usually is possible only when a seller controls a substantial share of a defined market for a product for which there are no adequate substitutes. See, e.g., *Sheridan* v. *Marathon Petroleum Co., LLC*, supra, 530 F.3d 594; *American Council of Certified Podiatric Physicians & Surgeons* v. *American Board of Podiatric Surgery, Inc.*, 185 F.3d 606, 622 (6th Cir. 1999); *Queen City Pizza, Inc.* v. *Domino's Pizza, Inc.*, 124 F.3d 430, 436–37 (3d Cir. 1997), cert. denied sub nom. *Baughans, Inc.* v. *Domino's Pizza, Inc.*, 523 U.S. 1059, 118 S. Ct. 1385, 140 L. Ed. 2d 645 (1998).

In theory, a parcel of land could be sufficiently unique to allow the owner to charge a supracompetitive price. This appears to have been the case in *Northern Pacific,*

Reserve Realty, LLC *v.* Windemere Reserve, LLC

in which the land at issue afforded unique access to essential transportation facilities.[17] *Northern Pacific Railway Co.* v. *United States*, supra, 356 U.S. 7. But the fact that each house, for example, is unique in various ways does not permit the owner to charge a supracompetitive price when it comes time to sell. Indeed, *Anderson* itself implicitly recognized this concept by noting that the *market value* of a parcel of land may not reflect its *emotional value* in the mind of the purchaser. *Anderson* v. *Yaworski*, supra, 120 Conn. 395–96. At no point does *Anderson* suggest that a property's "peculiar and special" emotional value; (internal quotation marks omitted) id., 396; somehow translates into an above market economic value.

Indeed, many products and services are unique. Land, used cars, purebred dogs, and private piano lessons are examples. But the fact that these things are not wholly fungible does not mean that every seller wields economic power for antitrust purposes. In a sense, the breeder has a tiny monopoly on Fido. There is no other dog in the world quite like him, and his eventual owner may come to think of him as priceless. Still, if the market price for a purebred German shepherd puppy in Hartford is $1200, and if other breeders have other German shepherd puppies for sale at that price, then there is no reason to expect that Fido's breeder will be able to exercise economic power and charge significantly more for him simply because of his inherent uniqueness. By extension, if Fido's breeder began requiring that each puppy buyer also purchase a leash from him, there would be little concern that the sale of Fido might unreasonably restrain competition in the leash market.

[17] In some sense, then, *Northern Pacific* can be understood as an application of the essential facilities doctrine, which applies in antitrust cases in which a monopolist controls access to uniquely necessary infrastructure, such as a railroad or a port. See, e.g., *MCI Communications Corp.* v. *American Telephone & Telegraph Co.*, 708 F.2d 1081, 1132 (7th Cir.), cert. denied, 464 U.S. 891, 104 S. Ct. 234, 78 L. Ed. 2d 226 (1983).

For similar reasons, we repudiate *Hossan-Maxwell, Inc.*, to the extent that it stands for the proposition that the uniqueness of a parcel of land, standing alone, confers market power for purposes of *Northern Pacific*.

D

To reiterate, in light of what we perceive to be the clear trajectory of federal tying law, as informed by modern antitrust scholarship, we overrule *Hossan-Maxwell, Inc.*, to the extent that it held that real estate list-back agreements affecting a not insubstantial volume of commerce are per se illegal. We hold instead that challenges to list-back agreements, like most other forms of tying agreements, are subject to the five element test adopted by the United States Court of Appeals for the Second Circuit in applying *Northern Pacific* and its progeny: "To state a valid tying claim . . . a [party] must allege facts plausibly showing that: [1] the sale of one product (the tying product) is conditioned on the purchase of a separate product (the tied product); [2] the seller uses actual coercion to force buyers to purchase the tied product; [3] the seller has sufficient economic power in the tying product market to coerce purchasers into buying the tied product; [4] the tie-in has anticompetitive effects in the tied market; and [5] a not insubstantial amount of . . . commerce is involved in the tied market." *Kaufman* v. *Time Warner*, 836 F.3d 137, 141 (2d Cir. 2016); accord *Yentsch* v. *Texaco, Inc.*, 630 F.2d 46, 56–57 (2d Cir. 1980). The leading treatise on the subject recognizes this as the prevailing test for tying claims. See 9 P. Areeda & H. Hovenkamp, supra, ¶ 1702, pp. 33–34 and n.1. We further emphasize that the third element of the test, economic power, typically must be established by proving that the defendant wields market power in a defined product and geographic market. *Kaufman* v. *Time Warner*, supra, 143. "[T]he best way to plead market power is to allege facts that, if proven, establish directly that

the price of the tied package is higher than the price of components sold in competitive markets.'' (Internal quotation marks omitted.) Id.

III

Finally, having clarified the standards that govern antitrust challenges to real estate list-back agreements, we consider whether the trial court's judgments can be affirmed, under the proper legal standard, on the basis of the trial court's express and implicit factual findings. For the reasons that follow, we conclude that they cannot.

A

First, and most important, the defendants did not plead the existence of any particular product or geographic market with respect to either the tying product (land of some sort) or the tied product (real estate broker services of some sort). Nor was any expert testimony introduced that would allow the trial court (1) to define those markets with any sort of precision for purposes of assessing economic power, (2) to quantify Woodland's power over the relevant property market, or (3) to assess the plaintiffs' share or foreclosure of the relevant broker service market.

The trial court did not make any relevant findings in this respect. It simply stated that, under *Hossan-Maxwell, Inc.*, the uniqueness of residential property is sufficient evidence of economic power to satisfy the first prong of *Northern Pacific* and, thus, that Woodland, as the sole owner of the Reserve parcels, had sufficient economic power to restrain competition in the market for the tied product, which it identified as real estate listing broker's services in the greater Danbury area. The trial court did not explain how it reached the conclusion that the relevant tied product market was limited to the greater Danbury area rather than

Reserve Realty, LLC *v.* Windemere Reserve, LLC

some larger geographic area, or explain why the relevant market was taken to be listing broker's services rather than a broader market, such as broker's services writ large, or a narrower one, such as the services of listing brokers specializing in large commercial and multifamily residential projects. The court also did not make any findings to support its apparent determination that the Reserve constituted the entire tying product market, such as that the Reserve was uniquely desirable and economically necessary because of its flexible zoning or other distinct characteristics.[18]

The Appellate Court, in affirming the trial court's judgments, implied that, in its view, the relevant tying product market consisted of "large area[s] of undeveloped land . . . in the densely populated Northeast"; the court opined that the Reserve was a rare example thereof. *Reserve Realty, LLC* v. *Windemere Reserve, LLC*, supra, 174 Conn. App. 145. It is unclear on what basis the Appellate Court reached these conclusions. Although there was some evidence in the record suggesting that there were few locations in Fairfield County suitable for building a 450,000 to 1.5 million square foot project, and also that flexible space with the sort of zoning approvals that the Reserve had obtained was very desirable, there is no indication that either (1) the trial court credited that evidence, or (2) the evidence

_____

[18] For these same reasons, the trial court's conclusions that the listing agreements violated General Statutes § 35-27, which prohibits attempted monopolization, and General Statutes § 35-28, which prohibits price fixing arrangements, also cannot be sustained. At the same time, the fact that the necessary market analyses were not performed means that we need not address the plaintiffs' other claims, such as that the Appellate Court incorrectly concluded that the defendants were coerced into agreeing to the list-back provisions and that the Reserve market was foreclosed to other commercial brokers.

We note that there was testimony at trial that three such "floating zone" properties were available in Danbury alone, which would seem to militate against the plaintiffs' theory that the Reserve was uniquely desirable. The trial court neither credited nor declined to credit that testimony.

Reserve Realty, LLC *v.* Windemere Reserve, LLC

bore out the Appellate Court's apparent belief that large tracts of undeveloped land represent the relevant product market or that the northeastern United States (however that term might be defined) represents the relevant geographic area. Specifically, there is no evidence in the record by which the Appellate Court could have applied the governing test and determined whether a small but significant and nontransitory increase in price with respect to the Reserve, or portions thereof, could be sustained or would lead customers to look elsewhere for substitute property. See footnote 14 of this opinion.

For their part, the defendants have taken the seemingly contradictory positions that either (1) the Reserve constitutes its own unique, singular product and geographic market, or (2) the relevant property market is national in scope. The fact that the defendants and the courts below were able to articulate four different, facially plausible but incommensurate geographic market definitions—the Reserve itself, the greater Danbury area, the Northeast, and the entire United States—highlights why expert economic testimony is necessary to resolve the issue of whether Woodland held sufficient power in a defined geographic market for land of some particular sort that it could foreclose competition and coerce buyers into accepting supracompetitive prices in some particular product market.

B

The second reason that the judgments cannot be sustained is that, to establish the third and fourth elements of a tying claim—economic power and anticompetitive effect—a buyer typically must be able to establish that the combined price for the tying product plus the tied product exceeded the market price. *Kaufman* v. *Time Warner*, supra, 836 F.3d 143; 9 P. Areeda & H. Hovenkamp, supra, ¶ 1702, p. 36. The trial court made no findings to that effect, and we doubt that the current

Reserve Realty, LLC *v.* Windemere Reserve, LLC

record would support such findings. At trial, a representative of Woodland offered undisputed testimony that, as a result of the need to resolve the plaintiffs' administrative appeal, Woodland agreed to a purchase price for parcels 13 and 15 that was significantly lower than what the parties ordinarily would have negotiated at arm's length. He further testified that, following a series of significant price reductions, the land sold for a mere fraction of the appraised value. There is no reason to believe, then, that the list-back agreements, on balance, had an anticompetitive effect on pricing.

We note in this regard that the fact that the defendants may have felt "forced" to accept the plaintiffs' broker services in order to acquire portions of the Reserve, while relevant to the second (coercion) prong of the Second Circuit test, says little to nothing about whether Woodland and the plaintiffs were able to exert market power or suppress competition. There are at least two reasons for this. First, the fact that a few individual buyers were sufficiently interested in a purchase to be willing to accept unwanted strings attached does not imply that, as a general matter, the sellers held market power. See, e.g., *McCormick* v. *Bradley*, supra, 870 P.2d 604–605; see also *Grappone, Inc.* v. *Subaru of New England, Inc.*, 858 F.2d 792, 796–97 (1st Cir. 1988) ("'[M]arket power' . . . means significant market power—more than the mere ability to raise price only slightly, or only on occasion, or only to a few of a seller's many customers. . . . Of course, virtually every seller . . . has some customers who especially prefer its product. But to permit that fact alone to show market power is to condemn ties that are bound to be harmless, including some that may serve some useful social purpose." (Citations omitted; emphasis omitted.)); 9 P. Arreeda & H. Hovenkamp, Antitrust Law, supra, ¶ 1718a, p. 244 (fact that tying arrangement interferes with cus-

Reserve Realty, LLC *v.* Windemere Reserve, LLC

tomer choice generally is irrelevant to antitrust analysis).

Second, the record in the present case supports various, possible explanations as to why the defendants were reluctantly willing to accept Woodland's condition that they agree to use the plaintiffs' broker services. It may be, as the defendants contend, that obtaining flexible zoning permits for the Reserve gave Woodland market power because the property became uniquely desirable and, in essence, a market of one. It also may be the case, though, that Woodland offered the defendants a very favorable, below market price for the land, either because Woodland was desperate to terminate the defendants' zoning appeal that was blocking development of the Reserve or because the brokerage requirement itself lowered the value of the property. If the defendants were only "forced" to accept the brokerage provision insofar as that was necessary for them to get a sweetheart deal on the land, and they could have secured comparable land elsewhere at a higher, market price, then competition policy need not be overly concerned that two sophisticated parties, engaged in a unique negotiation, ultimately agreed to include the tie as one of many negotiated provisions.[19] At the very least, expert testimony was necessary to shed light on the

---

[19] Although the trial court rejected the latter theory in its memorandum of decision, it did so not as the result of any contrary factual findings but, rather, because the court was of the view that, because any leverage that the defendants were able to assert by virtue of their administrative appeal was legal, it was irrelevant to the antitrust analysis. As we have explained, the court was mistaken in that regard.

Notably, the defendants conceded at trial that they proceeded to purchase the land, despite the list-back requirements, because it made good economic sense to do so and they believed that the deal was likely to be profitable. For their part, representatives of Woodland testified that they had procompetitive reasons for agreeing to adopt the list-back provisions in the first place, notably, the enhanced efficiency and quality control stemming from having a single team of brokers coordinate marketing for the Reserve, as well as the ability to negotiate *below market* commission rates.

fair market value of the property and the availability
of any comparable properties. See *Grappone, Inc.* v.
*Subaru of New England, Inc.*, supra, 858 F.2d 798 (citing
*United States Steel Corp.* v. *Fortner Enterprises, Inc.*,
429 U.S. 610, 618 n.10, 620 n.13, 97 S. Ct. 861, 51 L. Ed.
2d 80 (1977), for proposition that, "to show market
power, [the] plaintiff must show that an appreciable
number of buyers accepted the tie *in the absence of
other explanations for* [*their*] *willingness . . . to pur-
chase the package*" (emphasis altered; internal quota-
tion marks omitted)).

C

Third, competition policy generally is not offended
when only minor foreclosure of competition in the tied
market is possible. See 9 P. Areeda & H. Hovenkamp,
supra, ¶ 1704a pp. 54–55; id., ¶ 1709a, pp. 88–89. In the
present case, even if the tied product market at issue
were to be defined narrowly, such as to include only
listing broker services for large commercial and multi-
family residential properties in Danbury, it seems
unlikely on this record either that the listing agreements
could have permitted the plaintiffs to monopolize that
market or that prevailing brokerage fees would rise as
a result.[20]

The land at issue accounts for a very small share—
approximately 2 percent—of the total acreage of Dan-
bury, which the trial court assumed to be the relevant
geographic market.[21] Common experience suggests that

---

[20] Of course, should a retrial ultimately be necessary, the parties will have
the opportunity to make a record, and the trial court to make findings, about
all of these factual issues. In this part of the opinion, we merely explain
why, on the present record, we cannot impute to the trial court the findings
necessary to sustain the judgment.

[21] The Reserve, taken as a whole, spans 546 acres. We may take judicial
notice of the fact that this represents two percent of the 42 square mile
area of the city of Danbury. See Connecticut Economic Resource Center, Dan-
bury, Connecticut: CERC Town Profile 2019 (January 16, 2020) p. 1, avail-
able at http://s3-us-west-2.amazonaws.com/cerc-pdfs/2019/danbury-2019.pdf
(last visited March 23, 2020).

335 Conn. 174 JULY, 2020 211

Reserve Realty, LLC *v.* Windemere Reserve, LLC

the broker market features relatively low barriers to entry (new brokers easily can enter the market) and limited economies of scale (smaller brokerage companies and even individuals can effectively compete with larger firms because there is limited overhead, etc.). The listing agreements locked in a relatively low commission rate that may even have been below the market rate. Moreover, the agreements appear to apply only to the initial sale of each portion of the property, which represents a new addition to the town's building stock, so there is no long-term foreclosure (unlike in *Hossan-Maxwell, Inc.*) and no foreclosure of the existing building stock. Finally, the defendants testified that it was their ordinary practice to use their own in-house sales personnel, rather than other independent brokers, to market developments of this sort, and, in any event, prospective buyers were not precluded from using their own buyers' brokers, who could obtain a share of the commissions. In short, it seems highly unlikely that these agreements could permit the plaintiffs to corner the market for commercial broker services in Danbury, to the extent that that is the relevant market, or increase the average cost of broker commissions in that market. For all of these reasons, we conclude that, in light of our clarification of the legal standard governing antitrust challenges to tying arrangements, the trial court incorrectly determined that the defendants prevailed on their antitrust special defense.

The judgments of the Appellate Court are reversed and the cases are remanded to that court with direction to consider the plaintiffs' remaining claims.

In this opinion the other justices concurred.