THE RESERVE REALTY, LLC, ET AL. *v.*
WINDEMERE RESERVE, LLC, ET AL.
(SC 20635)
(SC 20637)

THE RESERVE REALTY, LLC, ET AL.
*v.* BLT RESERVE, LLC, ET AL.
(SC 20636)

Robinson, C. J., and McDonald, D'Auria,
Mullins, Ecker and Alexander, Js.

*Syllabus*

The plaintiffs, R Co., a real estate marketing company, and H, the executor of the estate of J, a broker who, along with S, was a founding member of R Co., sought to recover damages from the defendants, W Co. and B Co., for, inter alia, breach of certain real estate listing agreements that allegedly would have entitled the plaintiffs to certain brokerage fees and commissions. In 2002, a development group, D Co., engaged the services of J and S to negotiate the purchase of a large piece of property in the city of Danbury. D Co. then executed an agreement with J and S that gave them the exclusive right to sell or lease the property, or any part thereof, and that required any subsequent purchaser of the property to give J and S that same exclusive right. D Co. purchased the property and subsequently sold one parcel to W Co. and another parcel to B Co. Consistent with the exclusivity provision in D Co.'s agreement

Reserve Realty, LLC *v.* Windemere Reserve, LLC

with J and S, the defendants reluctantly agreed to include in each of their purchase and sale agreements a provision giving J and S the exclusive right to sell or lease any part of their respective parcels, and the defendants subsequently executed separate exclusive listing agreements with J and S to that effect. Those agreements expressly provided that their terms would "begin" when the defendants acquired ownership of their respective parcels and would expire ten years "from the date of the first conveyance of an individual unit or executed lease . . . ." Thereafter, B Co. constructed an apartment complex on its parcel, and W Co. devised plans to construct commercial office space on its parcel. J died in January, 2013, and B Co. ultimately used its own leasing agent to market the apartments, with the first lease being entered into in March, 2013. The plaintiffs then initiated the present actions, alleging, inter alia, breach and anticipatory breach of the exclusive listing agreements. The trial court heard extensive evidence regarding the contracting parties' intent, as well as testimony about certain contractual duties that J delegated to H, who was J's husband and employed by J as a licensed salesperson, and J's son, who is a licensed real estate broker with his own brokerage business. The trial court found for the defendants with respect to certain special defenses, concluding that the exclusive listing agreements were unenforceable because they violated state antitrust law, they did not satisfy the statutory (§ 20-325a (c)) requirement that commercial real estate listing agreements specify "the duration of the [brokerage] authorization," and they were personal service contracts that required J's personal performance. The Appellate Court affirmed the trial court's judgments in favor of the defendants on the ground that state antitrust law barred the plaintiffs' claims, but this court reversed the Appellate Court's judgments and remanded with direction to consider the plaintiffs' remaining claims. On remand, the Appellate Court again affirmed the trial court's judgments, concluding that the unambiguous language in the exclusive listing agreements did not satisfy the requirements of § 20-325a (c) in that the agreements did not specify the duration of the brokerage authorization, insofar as the duration identified therein was not capable of being measured because it could be calculated only by reference to an uncertain future event, namely, the date of the first conveyance. On the granting of certification, the plaintiffs appealed to this court. *Held*:

1. The Appellate Court incorrectly concluded that the exclusive listing agreements did not specify the "duration of the authorization," as required by § 20-325a (c) (2), and, therefore, that they did not comply with the requirements of that statute:

Because neither the statute nor the relevant regulations defined the word "duration," this court looked to its commonly approved usage and concluded that the term "duration of the authorization," as used in § 20-325a (c) (2), plainly and unambiguously refers to a measurable length

Reserve Realty, LLC *v.* Windemere Reserve, LLC

of time during which the authorization to act on behalf of the buyer or seller exists or lasts.

The express terms of the exclusive listing agreements in the present case provided that they began on the date the defendants acquired ownership of their respective parcels and expired ten years from the date of the first sale or lease of a unit on each respective parcel, and, because the length of time that the authorization would exist or last was capable of being measured, the agreements satisfied the requirement of § 20-325a (c) (2) that they specify the duration of the brokerage authorization.

Moreover, an agreement can establish a fixed duration, even if the duration cannot be determined at the outset of the making of the agreement, and, because the triggering event for the expiration of the authorizations was articulated with sufficient clarity to permit the parties to measure the length of the agreements, it was of no consequence that, when the exclusive listing agreements were executed, it was unclear for how long the parties would be bound insofar as no one knew if or when the first conveyance of an individual unit or executed lease would occur.

Furthermore, this court's construction of the statute did not yield absurd and unworkable results, but, rather, the duration of authorization specified in the exclusive listing agreements was clear, rational, and capable of being put into practice successfully, and, even if there were good public policy reasons for requiring commercial real estate listing agreements to contain a precise, fixed expiration date, this court declined to import such a requirement into § 20-325a (c) when it was not included in either the statute's plain language or the governing regulations.

2. This court affirmed the Appellate Court's judgments on the alternative ground that the exclusive listing agreements were unenforceable personal service contracts that required the personal performance of J:

Although contractual rights and obligations generally survive the death of the contracting parties, there is an exception to that rule for personal service contracts, as such contracts require the personal performance of the obligor, which is rendered impossible by the obligor's death.

Whether a contract is one for personal services depends on the intent of the contracting parties, as evidenced by the language of the contract, its subject matter, and the circumstances surrounding its execution, and, unless it is clear from the contract's express terms, such intent is a question of fact.

The language in the exclusive listing agreements was silent with respect to whether J's personal performance was required, but the inclusion of language binding the defendants' successors, assigns, and heirs, but not those of the named brokers, including J, suggested that the contracting parties did not intend the agreements to be assignable by the named

Reserve Realty, LLC *v.* Windemere Reserve, LLC

brokers or to survive their death or dissolution, and this court saw no reason to deviate from the view adopted by the trial court, which was consistent with out-of-state authority recognizing that the owner-broker relationship is a personal one based on mutual confidence, that an agreement for professional real estate brokerage services typically is a personal service contract.

Although the defendants selected J as their broker only because their agreement with D Co. required it of subsequent purchasers, the plaintiffs did not argue that those circumstances changed the nature of the contractual relationship to something other than one for personal services, and there was evidence from which the trial court reasonably could have inferred that the defendants were willing to enter into the exclusive listing agreements because they trusted J and had confidence in her professional abilities.

Moreover, J's delegation of some of her contractual duties to H and J's son did not establish that the exclusive listing agreements were not personal service contracts, as it is not improper for the individual providing the professional services to delegate administrative, ministerial, or subordinate tasks to other individuals under his or her direction, control, and supervision, so long as those individuals do not undertake the types of duties that require the discretion, skill, and expertise for which the obligor was hired, and, in view of the various inferences that might reasonably be drawn from a contracting parties' subsequent performance, this court could not conclude that J's delegation of some of her contractual duties to H and J's son necessarily meant that, at the time of contracting, the parties did not intend to execute personal service contracts.

Furthermore, the plaintiffs could not prevail on their claim that, despite a determination that the exclusive listing agreements were personal service contracts, the defendants nevertheless waived their right to insist on J's personal performance on the ground that, during her lifetime, they accepted the substitute performance of H and J's son, as the trial court reasonably found that there was no substitute performance because J fulfilled her duty of personal performance under the agreements by directing, supervising, and controlling the work of H and J's son, and by completing the types of obligations that induced the defendants to enter into the exclusive listing agreements..

Accordingly, the exclusive listing agreements were personal service contracts that terminated when J died in January, 2013, and, because no portion of either W Co.'s or B Co.'s parcel was leased or sold during J's lifetime, the defendants were not liable to the plaintiffs for any past, present, or future brokerage commissions.

Argued November 16, 2022—officially released April 4, 2023

346 Conn. 391 APRIL, 2023 395

Reserve Realty, LLC *v.* Windemere Reserve, LLC

*Procedural History*

Action, in the first case, to recover damages for, inter alia, breach of contract, and for other relief, brought to the Superior Court in the judicial district of Danbury, where the case was tried to the court, *Truglia, J.*; judgment for the named defendant et al., from which the plaintiffs appealed to the Appellate Court, *Alvord, Sheldon* and *Schaller, Js.*, which affirmed the trial court's judgment; thereafter, in the second and third cases, the court, *Truglia, J.*, rendered judgments discharging broker's liens on certain real property of the named defendant in each case in accordance with the parties' stipulations, from which the plaintiffs filed separate appeals with the Appellate Court, *Alvord, Sheldon* and *Schaller, Js.*, which affirmed the judgments of the trial court, and the plaintiffs, on the granting of certification, filed separate appeals in all three cases with this court, which reversed the Appellate Court's judgments and remanded the cases to the Appellate Court, which again affirmed the judgments of the trial court, and the plaintiffs, on the granting of certification, filed separate appeals with this court, which consolidated the appeals. *Affirmed.*

*Daniel E. Casagrande*, for the appellants (plaintiffs in each case).

*J. Christopher Rooney*, with whom was *Gideon Asimnor*, for the appellees (named defendant et al. in each case).

*Opinion*

ECKER, J. These consolidated appeals, which return to us for a second time, raise identical issues relating to the enforceability of four commercial real estate listing agreements.[1] In *Reserve Realty, LLC* v. *Winde-*

---

[1] The appeal in docket number SC 20635 arises from a breach of contract action, whereas the appeals in docket numbers SC 20636 and 20637 arise from actions to foreclose on broker's liens. See footnote 6 of this opinion. The certified issues in the three appeals are identical, and we consolidated the appeals pursuant to Practice Book § 61-7 (b) (1).

*mere Reserve, LLC*, 335 Conn. 174, 211, 229 A.3d 708 (2020) (*Reserve Realty I*), we held that the listing agreements did not violate state antitrust law and remanded the matter to the Appellate Court for consideration of the remaining grounds on which the defendants, BLT Reserve, LLC (BLT), and Windemere Reserve, LLC (Windemere),[2] had prevailed at trial. On remand, the Appellate Court determined that the listing agreements were unenforceable because they failed to specify the duration of the brokerage authorization, as required by General Statutes § 20-325a (b) and/or (c). See *Reserve Realty, LLC* v. *Windemere Reserve, LLC*, 205 Conn. App. 299, 302–303, 336, 258 A.3d 711 (2021) (*Reserve Realty II*). We granted certification to address whether the Appellate Court decided that issue correctly and, if not, whether the trial court's judgments should nonetheless be affirmed on the alternative ground that the listing agreements were unenforceable personal service contracts.[3] We conclude that the exclusive listing agreements comply with the durational requirement of § 20-325a (c) but that they are personal service contracts that required the personal performance of the named broker, Jeanette Haddad, and we affirm the judgments of the Appellate Court on that basis.

This is the sixth appellate opinion reviewing the judgments rendered by the trial court following a bench

---

[2] We refer to BLT and Windemere collectively as the defendants and individually by name when appropriate.

[3] We certified the following two issues: (1) "Did the Appellate Court correctly determine that the commercial real estate brokerage agreements were unenforceable because the terms of those agreements did not satisfy the requirement in . . . § 20-325a (c) that any such agreements state 'the duration of the authorization' contained therein?" And (2) "[d]id the trial court correctly determine that the listing agreements were contracts for the personal services of Jeanette Haddad and, therefore, that the defendants were not liable to any of the plaintiffs for brokerage commissions, even if the agreements had been enforceable by Jeanette Haddad during her lifetime?" *Reserve Realty, LLC* v. *Windemere Reserve, LLC*, 339 Conn. 901, 902, 260 A.3d 1224 (2021); accord *Reserve Realty, LLC* v. *BLT Reserve, LLC*, 339 Conn. 902, 902–903, 260 A.3d 1226 (2021); *Reserve Realty, LLC* v. *Windemere Reserve, LLC*, 339 Conn. 903, 260 A.3d 1223 (2021).

Reserve Realty, LLC *v.* Windemere Reserve, LLC

trial. We therefore assume familiarity with our opinion in *Reserve Realty I* and the Appellate Court's opinion in *Reserve Realty II*, and summarize only those facts essential to our resolution of the remaining issues. These appeals arise out of actions for breach of contract and foreclosure of broker's liens involving the sale and development of a 546 acre tract of land in Danbury (the Reserve). The primary brokers involved in the underlying transactions were Jeanette Haddad, a prominent, local real estate agent, who died in January, 2013, and Paul P. Scalzo. Jeanette Haddad operated a sole proprietorship under the business name "Jeanette Haddad, Broker," and Scalzo operated a real estate franchise under the business name Century 21 Scalzo Realty, Inc. (Scalzo Realty).[4] Jeanette Haddad employed several licensed salespersons, including her husband, Theodore Haddad, Sr., and, at times, she also engaged the services of her son, Theodore Haddad, Jr., a licensed real estate broker with his own brokerage business.

In 2002, Jeanette Haddad and Scalzo were hired by a group of real estate developers, later known as Woodland Group II, LLC (Woodland), to represent them in the purchase of the Reserve. Jeanette Haddad, Scalzo, and Woodland executed an "Exclusive Right to Sell— Listing Agreement" (Woodland agreement) to memorialize the brokerage relationship. The Woodland agreement gave Jeanette Haddad and Scalzo the exclusive right to sell and/or lease property in the Reserve. The agreement also contained the following provision: "[Woodland] shall make aware to the new purchaser of any

---

[4] Because there was no evidence that "Jeanette Haddad, Broker," was anything other than a sole proprietorship, there is no distinction between Jeanette Haddad in her personal capacity, as an individual, and Jeanette Haddad in her professional capacity, as a licensed broker. See, e.g., *Gould* v. *Stamford*, 331 Conn. 289, 308, 203 A.3d 525 (2019) (sole proprietorship is "[a] business in which one person . . . operates in his or her personal capacity or [o]wnership of such a business" (emphasis omitted; internal quotation marks omitted)). Neither Scalzo nor Scalzo Realty is party to the present appeals.

part, or of individual lots, or of land, that this [a]greement shall apply to that new purchaser and [Jeanette Haddad and Scalzo].''

Woodland thereafter succeeded in purchasing the Reserve, and Jeanette Haddad and Scalzo received a commission for facilitating the sale. Woodland proposed a master plan for the entire 546 acre parcel, which the Danbury Zoning Commission approved in November, 2002. Woodland subsequently continued to use the services of Jeanette Haddad and Scalzo to market the property to potential buyers. Their efforts to market the property were stymied, however, by Windemere, which was developing a neighboring parcel of land and had appealed the zoning approval for the Reserve. To resolve the zoning dispute, Woodland agreed to sell one portion of the Reserve (parcel 13) to BLT for residential development and another portion (parcel 15) to Windemere for commercial development.

Woodland had obligated itself under the Woodland agreement to require future purchasers of the Reserve to use the brokerage services of Jeanette Haddad and Scalzo Realty, and, consistent with this obligation, Woodland insisted that the purchase and sale agreements for parcels 13 and 15 include an exclusive listing agreement with Jeanette Haddad and Scalzo Realty. The defendants reluctantly agreed. Consequently, paragraph eight of the purchase and sale agreement for parcel 13 obligated BLT to enter into a listing agreement with Jeanette Haddad and Scalzo Realty, pursuant to which Jeanette Haddad and Scalzo Realty would receive a 3 percent commission on any subsequent sale and/or lease of parcel 13, either as a whole or as individual units. Similarly, paragraph eight of the purchase and sale agreement for parcel 15 obligated Windemere to enter into a listing agreement with Jeanette Haddad and Scalzo Realty, pursuant to which Jeanette Haddad and Scalzo Realty would receive a $1 million commis-

Reserve Realty, LLC *v.* Windemere Reserve, LLC

sion for their efforts in the leasing of office space that Windemere intended to develop on the parcel.

Woodland, BLT, and Windemere also executed an escrow agreement, which provided that the purchase and sale agreements for parcels 13 and 15 would be held in escrow by Woodland's counsel for ninety days until several conditions were met. One of the conditions was the execution of the necessary listing agreements by Jeanette Haddad and Scalzo Realty. Between July 17, and September 10, 2003, representatives of Woodland, BLT, Windemere, and Jeanette Haddad negotiated the terms of the listing agreements. On September 10, 2003, they executed a series of agreements, one of which designated Scalzo Realty, UC Properties, LLC,[5] and Jeanette Haddad as the exclusive agents to assist in the purchase of parcels 13 and 15 (buyer's agreement). On that same date, they also executed the exclusive listing agreements at issue in the present appeals: (1) the exclusive right to sell—listing agreement for parcel 13; (2) the exclusive right to sell/lease—listing agreement for parcel 13; (3) the exclusive right to sell/lease—listing

_____

[5] UC Properties, LLC, is the former name of the plaintiff The Reserve Realty, LLC (Reserve Realty). Although the entity is identified as a third broker (in addition to Scalzo Realty and Jeanette Haddad) in two of the four exclusive listing agreements, the trial court found that "all of the parties—including the plaintiffs—intended that the [exclusive] listing agreements were between the defendants and [Jeanette] Haddad and Scalzo, and not Reserve Realty," and that "Reserve Realty was intended, to the extent that the parties thought of it at all, to be nothing more than a corporate entity through which commissions due and payable from all the Reserve parcel transactions, not just the BLT and Windemere transactions, would be processed for the benefit of [Jeanette] Haddad and Scalzo." The trial court's factual finding is supported by the evidence adduced at trial demonstrating that UC Properties, LLC, was not incorporated or a licensed broker at the time the exclusive listing agreements were executed. Additionally, Scalzo testified that the purpose of Reserve Realty was to receive commissions from the sale or lease of property within the Reserve and to split those commissions evenly between Jeanette Haddad and Scalzo Realty. Because there is evidence in the record to support the trial court's factual finding on this point, we reject the plaintiffs' suggestion that it is clearly erroneous.

agreement for parcel 15; and (4) the exclusive right to sell—listing agreement for parcel 15. Pursuant to these four listing agreements (collectively, exclusive listing agreements), Jeanette Haddad and Scalzo Realty were appointed as the sole and exclusive agents to market, sell, and/or lease parcel 13, parcel 15, or any individual unit thereof.

The defendants thus agreed to use Jeanette Haddad and Scalzo Realty as the exclusive brokers for the sale or lease of parcels 13 and 15 to satisfy the requirements of paragraph eight of the purchase and sale agreements, and the reason that the parties included paragraph eight in the purchase and sale agreements was to allow Woodland to comply with its contractual obligation under the Woodland agreement to require subsequent purchasers of the Reserve to retain Jeanette Haddad and Scalzo Realty as their brokers.

Beginning in early 2006, representatives of Jeanette Haddad and Scalzo Realty, including Theodore Haddad, Sr., and Theodore Haddad, Jr., marketed and contacted possible buyers and lessees for the Reserve. The defendants decided at some point, however, that the listing agreements were a "bad marriage," and, in January, 2007, a representative of the defendants, Paul Kuehner, met with Theodore Haddad, Jr., to discuss terminating the broker/client relationship. Ultimately, Jeanette Haddad and Scalzo refused the buyout figure offered by the defendants. Jeanette Haddad and Scalzo Realty thereafter continued to make good faith efforts to find prospective buyers or lessees for parcels 13 and 15, but the real estate market softened in mid-2007, and those efforts were unsuccessful.

The defendants began to explore other available options to generate revenue, including the development of parcel 13 into a luxury apartment rental complex. In April, 2011, the Danbury Planning and Zoning Depart-

Reserve Realty, LLC *v.* Windemere Reserve, LLC

ment issued a site plan approval to BLT for the construction of a rental apartment complex on parcel 13, later known as Abbey Woods. The defendants began construction, and BLT subsequently leased the apartment units in Abbey Woods through its own on-site leasing agent, with the first lease being entered into in March, 2013. The defendants did not notify Jeanette Haddad, Theodore Haddad, Sr., Theodore Haddad, Jr., or Scalzo of the zoning approval or construction of the Abbey Woods apartments.

Jeanette Haddad died in January, 2013. Theodore Haddad, Jr., learned about Abbey Woods shortly after his mother's death and contacted Carl Kuehner, Jr., to find out whether the defendants intended to honor the exclusive listing agreements. Carl Kuehner, Jr., refused to discuss the issue with Theodore Haddad, Jr., claiming that the exclusive listing agreements for parcel 13 were personal service agreements between BLT and Jeanette Haddad.

In July, 2013, the plaintiffs, Theodore Haddad, Sr., as executor of the estate of Jeanette Haddad, and The Reserve Realty, LLC (Reserve Realty), a limited liability company organized by Jeanette Haddad and Scalzo to receive brokerage commissions on their behalf from the sale or lease of property within the Reserve, filed the present action, alleging breach of contract and anticipatory breach with regard to the buyer's agreement and exclusive listing agreements for both parcels 13 and 15.[6] "[T]he plaintiffs (1) claimed that they are entitled to their percentage of commission of gross rentals from the Abbey Woods units already leased, and a percentage

---

[6] The plaintiffs filed two separate complaints for breach of contract, one with respect to parcel 13 and the other with respect to parcel 15. The plaintiffs likewise commenced two separate actions to foreclose on broker's liens recorded on parcel 13 and parcel 15, respectively. The parties later stipulated that the disposition of the breach of contract action was dispositive of the foreclosure actions.

Reserve Realty, LLC *v.* Windemere Reserve, LLC

of estimated gross rental receipts yet to be realized by BLT for this development over the ten year term of the agreement that began on the date of the first lease; (2) asked the court to recognize their claim for a $1 million commission for office space that will be due and payable when Windemere constructs and begins leasing office space on parcel 15; and (3) sought a declaratory judgment recognizing their right to serve as the exclusive listing agents henceforward for the sale and/or lease of any Abbey Woods units and office space on parcel 15.

"The defendants raised five special defenses: (1) the [exclusive] listing agreements were entered into pursuant to an illegal tying arrangement; (2) there was a lack of consideration in that the plaintiffs had failed to perform brokerage services entitling them to compensation; (3) the [exclusive] listing agreements were personal service contracts; (4) the [exclusive] listing agreements, by their express terms, expired on September 10, 2010; and (5) the [exclusive] listing agreements were unenforceable because the necessary conditions precedent had not been satisfied." (Internal quotation marks omitted.) *Reserve Realty, LLC* v. *Windemere Reserve, LLC*, supra, 205 Conn. App. 309.

The trial court, *Truglia, J.*, conducted a twelve day bench trial, at the conclusion of which it found in favor of the defendants on three of their five special defenses. See id., 310–12. More specifically, the court determined that the exclusive listing agreements were not enforceable because (1) they created an illegal tying arrangement in violation of the Connecticut Antitrust Act, General Statutes § 35-24 et seq., (2) they did not satisfy the requirement of § 20-325a that such agreements specify the duration of the exclusive brokerage authorization, and (3) they were personal service contracts that required the personal performance of Jeanette Haddad. See id., 313.

346 Conn. 391        APRIL, 2023        403

Reserve Realty, LLC *v.* Windemere Reserve, LLC

The plaintiffs appealed, challenging all three grounds relied on by the trial court. See *Reserve Realty, LLC* v. *Windemere Reserve, LLC*, 174 Conn. App. 130, 132, 165 A.3d. 162 (2017), rev'd, 335 Conn. 174, 229 A.3d 708 (2020); see also *Reserve Realty, LLC* v. *BLT Reserve, LLC*, 174 Conn. App. 150, 151–52, 165 A.3d 159 (2017), rev'd, 335 Conn. 174, 229 A.3d 708 (2020); *Reserve Realty, LLC* v. *Windemere Reserve, LLC*, 174 Conn. App. 153, 155, 165 A.3d 160 (2017), rev'd, 335 Conn. 174, 229 A.3d 708 (2020). The Appellate court affirmed the judgments of the trial court, concluding that the defendants' antitrust special defense barred the plaintiffs' claims pursuant to the governing standard set forth in *State* v. *Hossan-Maxwell, Inc.*, 181 Conn. 655, 662–63, 436 A.2d 284 (1980). See *Reserve Realty, LLC* v. *Windemere Reserve, LLC*, supra, 174 Conn. App. 141–45, 150. In *Reserve Realty I*, we overruled *Hossan-Maxwell, Inc.*, reversed the Appellate Court's judgments with regard to the defendants' antitrust special defense, and remanded the cases to that court with direction to consider the plaintiffs' remaining claims. See *Reserve Realty LLC* v. *Windemere Reserve, LLC*, supra, 335 Conn. 178, 211.

On remand, the Appellate Court once again affirmed the judgments of the trial court, this time on the ground that the unambiguous language[7] in the exclusive listing

[7] The trial court determined that the exclusive listing agreements were ambiguous and incomplete because "[t]he evidence adduced at trial was evenly balanced between two findings: (1) that all of the agreements were intended to expire on September 10, 2010 [under the buyer's agreement] . . . and (2) that the term of the agreements began with the date of the first sale or lease of a unit and [were to] continue for a period of ten years thereafter." (Citation omitted.) The Appellate Court disagreed, concluding that, although the buyer's agreement expired on September 10, 2010, and the exclusive listing agreements were to expire ten years from the first sale or lease of parcel 13, parcel 15, or a portion thereof; see part I of this opinion; the different expiration dates did not render the agreements ambiguous because "the buyer's agreement and the [exclusive] listing agreements governed different aspects of the relationship between the parties. Specifically, the buyer's agreement granted the named brokers the exclusive right

Reserve Realty, LLC *v.* Windemere Reserve, LLC

agreements did not satisfy what it deemed to be the statutory requirements of § 20-325a. See *Reserve Realty, LLC* v. *Windemere Reserve, LLC*, supra, 205 Conn. App. 336–337. The Appellate Court noted that, although exclusive listing agreements in commercial real estate transactions need not contain a precise expiration date, they must "specify the 'duration' of the broker's authorization to act on behalf of the defendants." Id., 324; see id., 323–24 (citing § 20-325a (b) and (c), and § 20-328-6a (d) of the Regulations of Connecticut State Agencies). The term "duration" in § 20-325a (c) (2) is not defined, but the Appellate Court held that it plainly and unambiguously "refers to an amount of time that is capable of being measured." Id., 326; see id., 325–26. The Appellate Court concluded that the term identified in the exclusive listing agreements was not capable of being measured "because it could be calculated only by reference to an uncertain future event," and "the problem [was] compounded by the fact that the provision also [did] not provide a ceiling on the ultimate amount of time the listing agreements could last." Id., 326. Because the parties could be bound by the exclusive listing agreements indefinitely, the Appellate Court concluded that they did not comply "with the plain meaning of the duration requirement of § 20-325a (b) and/or (c) (2)."[8] Id., 327.

to represent [the defendants] in purchasing parcels 13 and 15 from Woodland, and such authorization expired on September 10, 2010. The [exclusive] listing agreements, by contrast, granted the named brokers the exclusive right to sell/lease parcels 13 and 15, or portions thereof, on behalf of [the defendants] for a period of ten years from the date of the first conveyance of an individual unit or executed lease to an unrelated party, after [the defendants] had acquired ownership of the parcels." *Reserve Realty, LLC* v. *Windemere Reserve, LLC*, supra, 205 Conn. App. 320. Because the durational language in the exclusive listing agreements was definitive and unambiguous, the Appellate Court did "not consider any extrinsic evidence regarding the parties' intent." Id., 322.

[8] The Appellate Court rejected the plaintiffs' alternative claim that they were entitled to recover brokerage commissions under subsection (d) of § 20-325a, reasoning that (1) the exclusive listing agreements did not substantially comply with the requirements of subsection (b) or (c) of § 20-325a

Reserve Realty, LLC *v.* Windemere Reserve, LLC

The Appellate Court affirmed the judgments of the trial court without reaching the issue of whether the exclusive listing agreements were personal service contracts. See id., 303 n.2, 337. We granted certification to determine whether the exclusive listing agreements comply with the durational requirement in § 20-325a (c) (2) and require the personal performance of Jeanette Haddad. See footnote 3 of this opinion.

I

A real estate broker in Connecticut may recover a commission only if the listing agreement meets the requirements of § 20-325a (b) or (c).[9] See *McCutcheon & Burr, Inc.* v. *Berman*, 218 Conn. 512, 519, 590 A.2d 438 (1991). Subsection (c) applies to commercial real estate transactions,[10] and it provides "a more flexible standard for a writing . . . than that which applies to non-commercial transactions." *Location Realty, Inc.* v. *Col-*

---

because "the duration of an [exclusive right to sell listing agreement] goes to the root or essence of the agreement"; *Reserve Realty, LLC* v. *Windemere Reserve, LLC*, supra, 205 Conn. App. 332; and (2) it would not be inequitable to deny the plaintiffs recovery because no sale or lease occurred "until nearly ten years after the [exclusive] listing [agreements were] executed, and approximately two months after [the death of Jeanette Haddad]." Id., 334.

[9] The Appellate Court concluded that the exclusive listing agreements did not comply with subsection (b) (4) of § 20-325a, which requires a contract for broker services to "contain the conditions of such contract or authorization . . . ." General Statutes § 20-325a (b) (4); see *Reserve Realty, LLC* v. *Windemere Reserve, LLC*, supra, 205 Conn. App. 323–24. The scope of subsection (b) (4) is not at issue in these certified appeals, and, therefore, to prevail on their claims, the plaintiffs must satisfy the statutory requirements of subsection (c). See General Statutes § 20-325a (c) (1) and (2) (precluding action to recover brokerage commission in commercial real estate transaction unless there is "a contract or authorization meeting the requirements of subsection (b) of [§ 20-325a]" or "a memorandum, letter or other writing" meeting requirements of subsection (c)).

[10] A "commercial real estate transaction" is defined as "any transaction involving the sale, exchange, lease or sublease of real property other than real property containing any building or structure occupied or intended to be occupied by no more than four families or a single building lot to be used for family or household purposes." General Statutes (Rev. to 2021) § 20-311 (9).

Reserve Realty, LLC *v.* Windemere Reserve, LLC

*accino*, 287 Conn. 706, 718, 949 A.2d 1189 (2008). It is undisputed that the transactions at issue in the present case are commercial real estate transactions under subsection (c) of § 20-325a. See footnote 10 of this opinion. Thus, to prevail on their claims, the plaintiffs must establish that they had "a memorandum, letter or other writing stating for whom the licensee will act or has acted, signed by the party for whom the licensee will act or has acted in the commercial real estate transaction, *the duration of the authorization* and the amount of any compensation payable to the licensee . . . ." (Emphasis added.) General Statutes § 20-325a (c) (2); cf. General Statutes § 20-325a (b) (3) and (4) (requiring signed and written contract "show[ing] the date on which such contract was entered into or such authorization given" and "contain[ing] the conditions of such contract or authorization"). Pursuant to the Regulations of Connecticut State Agencies, a residential real estate listing agreement must specify "the date on which the listing agreement is entered into *and its expiration date*"; (emphasis added) Regs., Conn. State Agencies § 20-328-6a (a) (1); whereas a commercial real estate listing agreement, like the ones at issue in the present case, must identify only "*the duration of the authorization* . . . ." (Emphasis added.) Id., § 20-328-6a (d).

The term "duration" is not defined in the statutory scheme or the regulations, so we look to "the commonly approved usage of the language . . . ." General Statutes § 1-1 (a). "Duration" is defined as "a portion of time which is measurable or during which something exists, lasts, or is in progress . . . ." Webster's Third New International Dictionary (2002) p. 703; see Black's Law Dictionary (11th Ed. 2019) p. 635 (defining "duration" as "[t]he length of time something lasts"). We agree with the Appellate Court that the term "duration of the authorization" plainly and unambiguously refers to a measurable length of time during which the authori-

346 Conn. 391 APRIL, 2023 407

Reserve Realty, LLC *v.* Windemere Reserve, LLC

zation to act on behalf of the buyer or seller exists or lasts. See *Reserve Realty LLC* v. *Windemere Reserve, LLC*, supra, 205 Conn. App. 324–26. We disagree, however, that the terms of the exclusive listing agreements failed to satisfy this statutory requirement.

The exclusive listing agreements at issue[11] provide in relevant part: "The term of this [a]greement shall begin at the time [the respective defendant] becomes the owner, option holder, designator, etc. of the [p]roperty and be for a period of . . . [120] months from the date of the first conveyance of an individual unit or executed lease to an unrelated party of [the respective defendant], and shall be renewable by mutual agreement by both parties. . . ." By its express terms, this provision states that the agreements begin on the date that the defendants acquire ownership of parcels 13 and 15, respectively, and expire ten years from the date of the first sale or lease of a unit on each respective parcel.[12]

[11] We treat all four of the agreements the same, as did the Appellate Court. Although the point is not raised by the parties, we note that the language in the four agreements is not identical. The exclusive right to sell/lease listing agreement for parcel 13 does not contain an explicit durational provision, and the exclusive right to sell/lease listing agreement for parcel 15 provides: "This [l]isting [a]greement shall terminate on sale or lease to a bona fide purchaser/tenant and the payment of the compensation as set forth herein." The payment of $1 million in compensation was payable "on either the sale of the [p]roperty, or at the issuance of the first [c]ertificate of [o]ccupancy . . . for an office building constructed on said [p]roperty" as follows: "$100,000 upon the sale of the [p]roperty or upon the issuance of the first [certificate of occupancy] for an office building constructed on the [p]roperty, and $100,000 on the anniversary date of the sale of the [p]roperty or upon the issuance of said [certificate of occupancy] for each of the next nine . . . years."

Because the parties do not address the language of these two agreements in their appellate briefs, we confine our analysis to the language of the exclusive right to sell listing agreement for parcel 13 and the exclusive right to sell listing agreement for parcel 15, consistent with the presentation of the issue on appeal.

[12] The defendants contend that the durational language in these agreements is ambiguous because it contains two different start dates: (1) the date on which the defendants became the owner, option holder, or designator of parcels 13 and 15; and (2) the date of the first conveyance of an individual

Reserve Realty, LLC *v.* Windemere Reserve, LLC

Because the length of time that the authorization exists or lasts is capable of being measured, we conclude that it satisfies the durational requirements in § 20-325a (c) (2). See *Reserve Realty, LLC* v. *Windemere Reserve, LLC*, supra, 205 Conn. App. 326 (recognizing that "the provision at issue . . . is written in such a way that the amount of time for which the listing agreements would be in effect is capable of being measured in some sense because it specifies a ten year period that begins to run from the time of the first conveyance or lease of a unit").

The Appellate Court concluded that the duration of these agreements was indeterminate because, "when the [exclusive] listing agreements were executed, it was entirely unclear how far into the future the parties would be bound by the provision" insofar as "no party . . . knew if or when 'the first conveyance of an individual unit or executed lease' would occur with respect to parcel 13 or parcel 15." Id. We disagree. "An agreement can establish a fixed duration even if its duration cannot be determined ab initio . . . ." (Citation omitted.) *Reddington* v. *Staten Island University Hospital*, 511 F.3d 126, 137 (2d Cir. 2007); see *A.T.N., Inc.* v.

unit or executed lease. We reject this claim because the start date is clear: the exclusive listing agreements expressly state that they "*shall begin at the time* [*the respective defendant*] *becomes the owner, option holder, designator, etc. of the* [*p*]*roperty* . . . ." (Emphasis added.) Thus, the agreements became effective on the date the defendants took title to parcels 13 and 15: December 20, 2005. The date of the first conveyance is not the start date but, rather, a triggering event that commences the ten year countdown to the expiration of the agreements.

Alternatively, the defendants argue that the Appellate Court incorrectly determined that the language of these agreements is not ambiguous because, as the trial court correctly found, when the agreements are read in conjunction with the buyer's agreement, it is not clear whether (1) all of the agreements expired on September 10, 2010, or (2) all of the agreements were to expire ten years after the first conveyance or executed lease. We do not address this issue because it is outside the scope of the questions certified for our review. See, e.g., *Mangiafico* v. *Farmington*, 331 Conn. 404, 417 n.5, 204 A.3d 1138 (2019).

Reserve Realty, LLC *v.* Windemere Reserve, LLC

*McAirlaid's Vliesstoffe GmbH & Co. KG*, 557 F.3d 483, 487 (7th Cir. 2009) (under Illinois law, contract is of definite duration if it expires "upon the occurrence of a specific [objective] event"); *Rooney* v. *Tyson*, 91 N.Y.2d 685, 692, 697 N.E.2d 571, 674 N.Y.S.2d 616 (1998) (rejecting notion that contract's "definite duration can be found only in a determinable calendar date"); *MS Real Estate Holdings, LLC* v. *Donald P. Fox Family Trust*, 362 Wis. 2d 258, 277–78, 864 N.W.2d 83 (2015) ("[W]e do not require parties to express duration in temporal terms in order to avoid indefiniteness. Rather, parties are free to identify triggering events that give rise to termination of the contract in one form or another."). The specific end date of the exclusive listing agreements was not known at the time of their execution because the triggering event had not yet occurred. But the *duration* of the agreements was always known and measurable—the agreements commenced on the date the defendants took title to parcels 13 and 15 and terminated ten years from the date of the first sale or lease of parcel 13, parcel 15, or an individual unit thereof. Cf. *Rooney* v. *Tyson*, supra, 692 (concluding that employment contract was of definite duration because "the boundaries of beginning and end of the employment period [were] sufficiently ascertainable"); *MS Real Estate Holdings, LLC* v. *Donald P. Fox Family Trust*, supra, 280 (holding that, "so long as [a] right of first refusal clearly identifies a triggering event, whether certain or uncertain to occur, it is definite as to duration"). In sum, the exclusive listing agreements specified the "duration of the authorization" because the triggering event for the expiration of the authorizations was articulated with sufficient clarity to permit the parties to measure the length of the agreements, as required by § 20-325a (c) (2).

The defendants contend that our construction of the statute yields an absurd and unworkable result because parcel 15 remains undeveloped, and it is unclear when,

Reserve Realty, LLC *v.* Windemere Reserve, LLC

if ever, that parcel or any portion thereof will be leased or sold. Because the end date of the authorization pertaining to parcel 15 remains uncertain to this day,[13] the defendants argue that the term "duration" in § 20-325a (c) must be construed to require a precise, fixed expiration date. This argument misconstrues the meaning of "duration" in the present context. Far from being absurd and unworkable, the duration of the authorization specified in the exclusive listing agreements is clear, rational, and "capable of being put into practice successfully." (Internal quotation marks omitted.) *Rivers* v. *New Britain*, 288 Conn. 1, 17, 950 A.2d 1247 (2008). The question is not whether there are good public policy reasons to require a precise, fixed expiration date knowable from the outset of the contract. See *Reserve Realty, LLC* v. *Windemere Reserve, LLC*, supra, 205 Conn. App. 327. Perhaps there are. But we find no such requirement in the plain language of § 20-325a (c) (2) or the governing regulations. It is not the role of this court "to engraft additional requirements onto clear statutory language." *Dinan* v. *Marchand*, 279 Conn. 558, 577, 903 A.2d 201 (2006); see, e.g., *Hasychak* v. *Zoning Board of Appeals*, 296 Conn. 434, 441 n.8, 994 A.2d 1270 (2010) ("[I]t is the legislature, and not this court, that is responsible for formulating and implementing public policy. . . . When there is no ambiguity in the legislative commandment, this court cannot, in the interest of public policy, engraft amendments onto the statutory language." (Citations omitted; internal quotation marks omitted.)). Section 20-325a (c) (2) does not require commercial listing agreements to include a precise, fixed expiration date, and we will not import such a requirement into the statute.

For the foregoing reasons, we conclude that the exclusive listing agreements specified the "duration of

[13] With respect to parcel 13, the exclusive listing agreements expired in February, 2023, ten years after the first apartment at Abbey Woods was leased.

Reserve Realty, LLC *v.* Windemere Reserve, LLC

the authorization'' within the meaning of § 20-325a (c)
(2) and, therefore, complied with the requirements of
the statute.

II

The remaining question is whether the exclusive list-
ing agreements are personal service contracts that
require the personal performance of Jeanette Haddad.
The resolution of this issue is necessary because the
first conveyance of an individual unit or executed lease
on parcel 13 that would have generated a commission
under the exclusive listing agreements did not occur
until March, 2013—two months after Jeanette Haddad's
death. Because no sales or leases were consummated
during her lifetime,[14] the plaintiffs' right to recover bro-
kerage commissions is contingent on the survival of
the exclusive listing agreements after the death of Jea-
nette Haddad.[15]

Contractual rights and obligations generally survive
the death of the contracting parties. See, e.g., *Booth* v.
*Northrop*, 27 Conn. 325, 329 (1858). There is an excep-
tion to this general rule for personal service contracts,
however, because personal service contracts require
the personal performance of the obligor, which is ren-

[14] There is no claim that Jeanette Haddad produced a ready, willing, and
able buyer or lessee during her lifetime. See, e.g., *Storm Associates, Inc.* v.
*Baumgold*, 186 Conn. 237, 242, 440 A.2d 306 (1982) (''[t]his court has repeat-
edly held that a broker who has, in accordance with a listing contract, found
a purchaser ready, willing, and able to purchase, on the owner's own terms,
is entitled to its commission even though no contract for the sale of the
property has ever been executed'').

[15] As we explained in footnote 5 of this opinion, the trial found that the
contracting parties did not intend Reserve Realty to serve as a named broker
under the exclusive listing agreements. The trial court further found that
''[t]he plaintiffs presented insufficient evidence to establish by a preponder-
ance of the evidence that the parties intended that Reserve Realty would
survive Jeanette Haddad's death and serve as the listing broker.'' In light
of these factual findings, Reserve Realty's right to recover any brokerage
commissions under the exclusive listing agreements is completely dependent
on and derivative of the right of Jeanette Haddad.

dered impossible by the obligor's death. See 2 Z. Wolfe, Farnsworth on Contracts (4th Ed. 2022) § 9.07, p. 9-69 ("if a particular person's existence is necessary for performance of a duty, and performance is prevented by that person's death or disability, the duty is discharged"); see also 2 Restatement (Second), Contracts § 262, pp. 324–25 (1981) ("[i]f the existence of a particular person is necessary for the performance of a duty, his death or such incapacity as makes performance impracticable is an event the [nonoccurrence] of which was a basic assumption on which the contract was made"). Stated simply, "[when] distinctly personal considerations are at the foundation of the contract . . . the relation of the parties is dissolved by the death of the person whose personal qualities constituted the particular inducement to the contract." 30 Williston on Contracts (4th Ed. 2022) § 77:71.

The underlying idea is that performance cannot be delegated to another individual under a personal service contract because the contract requires "the exercise of personal skill or discretion." 3 Restatement (Second), supra, § 318, comment (c), p. 20; see 3 Z. Wolfe, supra, § 11.15, p. 11-99 (performance is nondelegable and " 'personal,' in the sense that the recipient must rely on qualities such as the character, reputation, taste, skill, or discretion of the party that is to render it"). "Thus if a specific artist is hired to paint a picture, the artist cannot delegate his duty of performing. . . . Personal performance is of the essence. Agreements to render professional services as a physician or [a] lawyer fall within this rule." (Citations omitted.) *Rossetti* v. *New Britain*, 163 Conn. 283, 291, 303 A.2d 714 (1972).

Whether a contract is one for personal services depends on the intent of the contracting parties, as evidenced by the language of the contract, its subject matter, and the circumstances surrounding its execution. See id. ("[w]hether a duty is personal such that it

Reserve Realty, LLC *v.* Windemere Reserve, LLC

cannot be delegated . . . is a question of the intention of the parties to be ascertained from the contract, its nature, and the attending circumstances''). Unless clear from the contract's express terms, the intent of the contracting parties is a question of fact. See, e.g., *Cruz* v. *Visual Perceptions, LLC*, 311 Conn. 93, 101, 84 A.3d 828 (2014) (when contract is ambiguous, "the determination of the parties' intent is a question of fact'' (internal quotation marks omitted)); see also 30 Williston on Contracts, supra, § 77.71 (whether contract requires personal performance is "intensely fact oriented'').

After listening to extensive evidence regarding the contracting parties' intent, the trial court found that "the parties intended that the broker recognized in the listing agreements to provide the brokerage services and who would be entitled to commissions pursuant to those agreements was Jeanette Haddad, personally, and that the agreements and performance obligations thereunder were nontransferable.'' We review the trial court's factual finding regarding the intent of the contracting parties for clear error.[16] "A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. . . . Because it is

[16] The plaintiffs claim that the standard of review is plenary "in view of the uncontradicted evidence'' that Jeanette Haddad "used her husband and son as her authorized agents in performing her obligations under the listing agreements.'' This claim is without merit. It is well established that the trial court, as the finder of fact, "has discretion to reject even uncontested evidence, on the theory that the fact finder is uniquely well situated to make determinations of witness credibility.'' *Willow Funding Co., L.P.* v. *Grencom Associates*, 246 Conn. 615, 623, 717 A.2d 1211 (1998). To the extent the plaintiffs claim that the trial court's factual finding was clearly erroneous on the ground that there was uncontroverted and overwhelming evidence that Jeanette Haddad had delegated some of her contractual duties to Theodore Haddad, Sr., and Theodore Haddad, Jr., we address the plaintiffs' claim in the body of this opinion.

Reserve Realty, LLC *v.* Windemere Reserve, LLC

the trial court's function to weigh the evidence and determine credibility, we give great deference to its findings. . . . In reviewing factual findings, [w]e do not examine the record to determine whether the [court] could have reached a conclusion other than the one reached. . . . Instead, we make every reasonable presumption . . . in favor of the trial court's ruling.'' (Internal quotation marks omitted.) *Gianetti* v. *Norwalk Hospital*, 304 Conn. 754, 765–66, 43 A.3d 567 (2012); see *Otto Contracting Co.* v. *S. Schinella & Son, Inc.*, 179 Conn. 704, 708, 427 A.2d 856 (1980) (trial court's factual findings must be upheld unless they are ''clearly erroneous in view of the evidence and pleadings in the whole record'').

The language of the exclusive listing agreements is silent with respect to whether they require Jeanette Haddad's personal performance. Although the agreements state that the benefits and duties set forth therein shall be binding on the defendants' respective ''successors and assigns'' or ''heirs and assigns,'' there is no corresponding provision regarding the benefits and duties flowing to the named *brokers'* successors, assigns, or heirs. The fact that the contracting parties explicitly agreed to bind the defendants' successors, assigns, and heirs, but not those of the named brokers, suggests that the parties did not intend the exclusive listing agreements to be assignable by the named brokers or to survive their death or dissolution. Cf. *Tallmadge Bros., Inc.* v. *Iroquois Gas Transmission System, L.P.*, 252 Conn. 479, 497, 746 A.2d 1277 (2000) (recognizing presumption that contractual language used by sophisticated commercial contracting parties reflects their intent).

We have not previously addressed whether an agreement for professional real estate brokerage services typically is a personal service contract. Having considered the matter, we see no reason to deviate from the

Reserve Realty, LLC *v.* Windemere Reserve, LLC

view adopted by the trial court, which is consistent with out-of-state authority recognizing that "[t]he owner-broker relationship is a personal one based on mutual confidence . . . ." (Citation omitted.) *Charles B. Webster Real Estate* v. *Rickard*, 21 Cal. App. 3d 612, 618, 98 Cal. Rptr. 559 (1971); see *Florance* v. *Kresge*, 93 F.2d 784, 786 (4th Cir. 1938) (real estate broker service contract "provided for personal services involving a relationship of personal confidence"); *Newton Centre Realty, Inc.* v. *Jaffe*, 97 Mass. App. 726, 729 n.5, 150 N.E.3d 811 (2020) ("the real estate broker-seller relationship is often very personal"); *Glacier Land Co., LLC* v. *Claudia Klawe & Associates, LLC*, 154 P.3d 852, 862 n.11 (Utah App. 2006) (commercial real estate brokerage contract required personal performance of broker), cert. denied, 168 P.3d 819 (Utah 2007); 29 Williston on Contracts (4th Ed. 2022) § 74:30 (there is contractual duty of personal performance by someone "who in return for a promised commission has undertaken to assist in the sale of land"). Given the personal and confidential nature of the relationship between a buyer/seller of real estate and a real estate broker, the parties to a brokerage agreement have the "right to select and determine with whom [they] will contract, and cannot have another person thrust [on them] without [their] consent. In the familiar phrase of Lord [Thomas] Denman, '[y]ou have the right to the benefit you anticipate from the character, credit and substance of the party with whom you contract.' " *Arkansas Valley Smelting Co.* v. *Belden Mining Co.*, 127 U.S. 379, 387, 8 S. Ct. 1308, 32 L. Ed. 246 (1888), quoting *Humble* v. *Hunter*, 116 Eng. Rep. 885, 887 (Q.B. 1848); accord *Florance* v. *Kresge*, supra, 787.

In the present case, the defendants contracted for the professional brokerage services of Jeanette Haddad, who was "a successful and highly regarded real estate broker operating in the Danbury real estate market . . . ." To be sure, Jeanette Haddad was selected

because the Woodland agreement required subsequent purchasers of the Reserve to use Jeanette Haddad and Scalzo Realty as their real estate brokers; the defendants would have used a different broker if they had their druthers. But the plaintiffs do not argue that these circumstances changed the nature of the contractual relationship to something other than one for personal services. Additionally, there was evidence from which the trial court reasonably could have inferred that the defendants were willing to enter into the exclusive listing agreements because they trusted Jeanette Haddad and had confidence in her professional abilities. Carl Kuehner, Jr., testified that Jeanette Haddad was "a highly competent broker" whom he held in "very high regard." There also was evidence that the Kuehner family had a long-standing friendship with the Haddad family and previously had retained the professional brokerage services of Jeanette Haddad.

At trial, the evidence was conflicting as to the defendants' intent to enter into a personal service contract, and the plaintiffs sought to demonstrate that the defendants understood from the outset that Jeanette Haddad would delegate some of her contractual duties to Theodore Haddad, Sr., and Theodore Haddad, Jr. For example, Paul Kuehner testified that he knew "that the Haddad family has worked as a team in the brokerage business for twenty-five, thirty years," and that Theodore Haddad, Sr., and Theodore Haddad, Jr., had "work[ed] with Jeanette Haddad . . . on [past] projects . . . ." He also testified, however, that his family had "parted ways in doing deals directly with" Theodore Haddad, Jr., and "did not hire" Theodore Haddad, Jr., as the broker in the present case. Similarly, Carl Kuehner, Jr., testified that he "knew that [Theodore] Haddad, Jr., and [Theodore] Haddad, Sr., worked closely with Jeannette Haddad in her broker's business" but that, at the time he

signed the exclusive listing agreements, he did not know that Theodore Haddad, Jr., would be involved as a broker, and, had he known, "there would have been a discussion within the [Kuehner] family" because the Kuehners had not had "great success with" Theodore Haddad, Jr., in the past and "would not have gone down that path as a family."

On the basis of this and other evidence, the trial court found that, although the defendants may have expected Theodore Haddad, Sr., to be involved in some way in Jeanette Haddad's fulfillment of her contractual obligations, that expectation did not alter the character of the exclusive listing agreements as personal service contracts because, "at all times relevant to the plaintiffs' claims, Theodore Haddad, Sr., was Jeanette Haddad's employee." The trial court further determined that the parties did not intend Jeanette Haddad's duty of personal performance to be completed by Theodore Haddad, Jr., finding "[t]he testimony of Carl Kuehner, Jr., [to be] clear, credible and unwavering that at no time did the defendants intend to engage Theodore Haddad, Jr., when they executed the [exclusive listing] agreements." We will not second guess this credibility determination on appeal. See, e.g., *Stratford Police Dept.* v. *Board of Firearms Permit Examiners*, 343 Conn. 62, 86, 272 A.3d 639 (2022) ("[I]t is the exclusive province of the trier of fact to make determinations of credibility . . . . Questions of whether to believe or to disbelieve a competent witness are beyond our review." (Internal quotation marks omitted.)). On the present record, we cannot conclude that the trial court's factual finding that the exclusive listing agreements require the personal performance of Jeanette Haddad was clearly erroneous.

The plaintiffs contend that the trial court's factual finding that the exclusive listing agreements are personal service contracts is inconsistent and irreconcilable with its factual finding that Jeanette Haddad dele

Reserve Realty, LLC *v.* Windemere Reserve, LLC

gated some of her contractual duties to Theodore Haddad, Sr., and Theodore Haddad, Jr. They argue that, because the duty of performance in a personal service contract cannot be delegated, and Jeanette Haddad delegated some of her contractual duties to her husband and son, it must follow that the exclusive listing agreements are not personal service contracts. We reject this logic for two reasons.

First, as the trial court implicitly recognized, individuals who provide professional services routinely retain employees and support staff to assist them in the completion of administrative, ministerial, or subordinate tasks. For example, lawyers employ paralegals, physicians employ medical assistants, and scientists employ laboratory technicians. So long as these employees act under the direction, control, and supervision of the individual rendering the professional services and do not undertake the types of duties that require the discretion, skill, and expertise for which the obligor was hired, there is nothing improper in delegating such administrative, ministerial, or subordinate tasks to employees or agents. See, e.g., 1 Restatement (Second), Agency § 17, illustration (2), p. 86 (1958) (sculptor hired to render personal services in completing statue may utilize assistant to block marble copy of statue).

Second, the parties' intent at the time of contracting should not be confused with their later performance of their contractual duties. After-the-fact conduct may be indicative of the contracting parties' original intent[17] or may establish a breach of the obligor's duty of personal performance. See *Ames* v. *Sayler*, 267 Ill. App. 3d 672, 677, 642 N.E.2d 1340 (1994) (farm tenancy was personal service contract that terminated upon obligor's death,

---

[17] See *Connecticut Co.* v. *Division 425, Amalgamated Assn. of Street, Electric Railway & Motor Coach Employees of America*, 147 Conn. 608, 617, 164 A.2d 413 (1960) ("[t]he practical construction indicated by the conduct of the parties over a period of time is evidence of intent").

Reserve Realty, LLC *v.* Windemere Reserve, LLC

even though obligor delegated his duty of performance during his lifetime), appeal denied, 159 Ill. 2d 563, 647 N.E.2d 1006 (1995); 3 Restatement (Second), Contracts, supra, § 318, illustration (5), p. 20. Alternatively, subsequent performance may simply be indicative of the types of administrative, ministerial, or similar tasks that the parties contemplated could be performed by the obligor's subordinates. There are various inferences that might reasonably be drawn from a contracting party's subsequent performance, and, on the present factual record, we cannot say that Jeanette Haddad's delegation of some of her contractual duties to Theodore Haddad, Sr., and Theodore Haddad, Jr., necessarily meant that, at the time of contracting, the parties did not intend to execute a personal service contract.

This brings us to the plaintiffs' alternative claim that, even if the exclusive listing agreements are personal service contracts, the defendants waived their right to insist on Jeanette Haddad's personal performance because, during Jeanette Haddad's lifetime, they accepted the substitute performance of Theodore Haddad, Sr., and Theodore Haddad, Jr., without complaint. We recognize that an obligee's knowledge of and consent to an obligor's improper delegation of an essential duty of personal performance, without complaint, may result in the waiver of the right to insist on personal performance. See, e.g., *RBC Nice Bearings, Inc.* v. *SKF USA, Inc.*, 318 Conn. 737, 756, 123 A.3d 417 (2015) (contractual rights may be waived by acceptance of "noncompliant performance"); *Bradford Novelty Co.* v. *Technomatic, Inc.*, 142 Conn. 166, 171, 112 A.2d 214 (1955) ("[t]he plaintiff, by its conduct, waived its right to strict compliance with the provisions of the contract"); *Banks Building Co., LLC* v. *Malanga Family Real Estate Holding, LLC*, 102 Conn. App. 231, 240–41, 926 A.2d 1 (2007) (upholding trial court's factual finding that property owner implicitly waived performance of

Reserve Realty, LLC *v.* Windemere Reserve, LLC

contractual provision through its conduct). See generally 4 A. Corbin, Contracts (1951) § 865, p. 451 ("[when] a performance is personal and not possible of delegation, the condition of personal performance is waived if the obligor assents to the substituted performance; and failure to object, with knowledge that the work is being performed by a substitute, may operate as assent."). But the trial court's factual findings in the present case reflect that the trial court considered and rejected the plaintiffs' claim of waiver. The trial court did not find that Jeanette Haddad failed to fulfill her essential duty of personal performance by delegating the types of duties that required the exercise of her personal discretion, skill, and expertise. Instead, the trial court essentially found that Jeannette Haddad fulfilled her duty of personal performance under the exclusive listing agreements by directing, supervising, and controlling her employees and completing the types of obligations that induced the defendants to enter into the agreements.[18] In other words, there was no substitute performance, and, therefore, the defendants did not

[18] The trial court found that Jeanette Haddad fulfilled her duty of personal performance, even though (1) "Jeanette Haddad was suffering from health ailments as early as 2003, which prevented her from actively promoting and marketing the parcels on behalf of the defendants," (2) "Theodore Haddad, Sr., and Theodore Haddad, Jr., performed services on Jeanette Haddad's behalf from 2003 to the time of her death, and in discharge of her obligations under the listing agreements," and (3) "at no time did the defendants object to their participation." The trial court's factual finding in this regard is supported by the testimony of Theodore Haddad, Jr., that Jeanette Haddad "authorized things, she approved things, she shared in meetings, she contributed concepts [and] ideas," and that the defendants "never" once complained "about any aspect of [Jeanette Haddad's] role in performing these contracts . . . ." Given Jeanette Haddad's fulfillment of her contractual duties, the trial court "agree[d] completely with the plaintiffs that Theodore Haddad, Sr., [as the executor of the estate of Jeanette Haddad] would have the right to bring an action on Jeanette Haddad's behalf if she had, during her lifetime and the term of a valid listing agreement, procured ready, willing, and able buyers or lessees. The right to recover for commissions earned pursuant to the listing agreements did not end with her death; what ended was her ability to perform under the agreements."

Reserve Realty, LLC *v.* Windemere Reserve, LLC

waive their right to insist on Jeanette Haddad's personal performance. Having thoroughly reviewed the evidence adduced at trial, we cannot say that the trial court's factual finding is clearly erroneous.[19] See, e.g., *RBC Nice Bearings, Inc.* v. *SKF USA, Inc.*, supra, 747 ("Waiver is a question of fact. . . . [When] the factual basis of the [trial] court's decision is challenged we must determine whether the facts set out in the memorandum of decision are supported by the evidence or whether, in light of the evidence and the pleadings in the whole record, those facts are clearly erroneous." (Internal quotation marks omitted.)).[20]

For the foregoing reasons, we conclude that the exclusive listing agreements were personal service contracts that terminated when Jeanette Haddad died in January, 2013. Because no portion of parcel 13 or parcel 15 was leased or sold during her lifetime, the defendants are not liable to the plaintiffs for any past, present, or future brokerage commissions.

The judgments of the Appellate Court are affirmed.

In this opinion the other justices concurred.

---

[19] In light of our conclusion, we do not address whether Theodore Haddad, Sr., and Theodore Haddad, Jr., were "subagents" of Jeanette Haddad under General Statutes § 20-325f. See General Statutes § 20-325f ("[n]o real estate broker shall make any unilateral offer of subagency or agree to compensate, appoint, employ, cooperate with or otherwise affiliate with a subagent for the sale or purchase of real property without the informed written consent of the person whom the real estate broker represents").

[20] Finally, and alternatively, the plaintiffs claim that (1) Jeanette Haddad's right to recover brokerage commissions vested prior to her death, and (2) Theodore Haddad, Sr., and Theodore Haddad, Jr., had the authority to continue to act on her behalf after her death to fulfill her obligations under the exclusive listing agreements. We summarily reject these claims because, as we explain in this opinion, the exclusive listing agreements terminated when Jeanette Haddad died, and no brokerage commissions were generated during her lifetime.